Robert Glen COE, Petitioner,

v.

Ricky BELL, Warden, Respondent.

No. 3:00–0239.

United States District Court,
M.D. Tennessee,
Nashville Division.

March 29, 2000.

Henry Alan Martin, Paul R. Bottei, Federal Public Defender's Office, Nashville, TN, James Holt Walker, Nashville, TN, for Robert Glen Coe, petitioner.

Glenn Richard Pruden, Office of the Attorney General, Nashville, TN, for Ricky Bell, Warden at RMSI, respondent.

## MEMORANDUM

TRAUGER, District Judge.

For the reasons set out in the accompanying Memorandum, Robert Glen Coe's Petition for a Writ of *Habeas Corpus* is **DENIED** in all respects. The stay of execution issued by this court on March 22, 2000 is hereby lifted.

Before the court is Robert Glen Coe's Petition for Writ of Habeas Corpus (Docket No. 1), to which Respondent has filed an Answer (Docket No. 9) and Petitioner has filed a Reply (Docket No. 30).

### STATEMENT OF FACTS and PROCEDURAL HISTORY

The present petition is limited to the issue of Coe's competency to be executed. Accordingly, the court confines itself to this issue in recounting the relevant facts and history of the case.[1]

After the United States Supreme Court declined to review Coe's last habeas corpus case,[2] the State of Tennessee filed a

---

1. For a more complete statement of the underlying facts and procedural history of this case, see *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998).

2. *Coe v. Bell*, —— U.S. ——, 120 S.Ct. 110, 145 L.Ed.2d 93, *reh'g denied*, —— U.S. ——, 120 S.Ct. 567, 145 L.Ed.2d 442 (1999).

motion in the Tennessee Supreme Court requesting that a date be set for his execution. On December 15, 1999, the Tennessee Supreme Court entered an order setting Coe's execution for March 23, 2000 and stating that any claim of incompetency to be executed was now ripe. Coe made such a claim and the Tennessee Supreme Court remanded the matter to the Shelby County Criminal Court, where Coe was originally tried and convicted, ordering that the competency issue be determined under the procedures and standards set out in *Van Tran v. State,* 6 S.W .3d 257 (Tenn.1999).

Coe filed a petition supported by a psychiatrist's affidavit in the Shelby County Criminal Court, asserting that he is incompetent to be executed. On January 3, 2000, Judge John P. Colton, Jr. found that Coe had satisfied the threshold showing required by *Van Tran* and that his competency to be executed was genuinely in issue. An evidentiary hearing was held before Judge Colton from January 24 to January 28, 2000. On February 2, 2000, Judge Colton issued a 28–page opinion,[3] finding that Coe was "presently mentally competent to be executed" under the *Van Tran* standard—he has the mental capacity to understand the fact of the impending execution and the reason for it.

Coe then appealed Judge Colton's order to the Tennessee Supreme Court. After a *de novo* review of all claims, on March 6, 2000, the Tennessee Supreme Court issued an opinion affirming the decision of the trial court that Coe is presently competent to be executed. *See Coe v. State,* 2000 WL 246425, —— S.W.3d —— (Tenn. Mar.6, 2000), *cert. denied,* —— U.S. ——, 120 S.Ct. 1460, —— L.Ed.2d —— (2000). The court also reaffirmed that the procedures established in *Van Tran* provide at least the due process to which the petitioner is

entitled under *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), and that those procedures were followed in his hearing before Judge Colton.

On March 16, 2000, Coe filed a Petition for Writ of Habeas Corpus in this court. On March 17, 2000, Respondent Ricky Bell filed an Answer to Petition for Writ of Habeas Corpus (Docket No. 9). On March 18, 2000, this court transferred this case to the Sixth Circuit Court of Appeals for a determination of whether this court had jurisdiction to review the petition. On March 21, 2000, the Sixth Circuit Court of Appeals held that this court did have jurisdiction. On March 22, 2000, this court issued a stay of the March 23, 2000 execution pending this court's review of Coe's claims.

### STANDARD OF REVIEW

In holding that this court did have jurisdiction to rule on the present petition, the Sixth Circuit Court of Appeals did not explicitly state the proper jurisdictional basis for this court's review.

■ Although Petitioner asserts that this court has jurisdiction over the present petition under 28 U.S.C. § 2241 and 28 U.S.C. § 2254, the court finds that jurisdiction over this petition is proper only under 28 U.S.C. § 2254. In directing this court to review Petitioner's *Ford* claim on the merits, the Sixth Circuit held that "[u]nder the unique circumstances of this case, where any prior attempt to raise the *Ford* issue would almost certainly have been dismissed as premature, it would not have been an abuse of the writ to permit the district court to consider it. *See In re Hanserd; Stewart v. Martinez–Villareal,* 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998); *see also Nguyen v. Gibson,* 162 F.3d 600, 601 (1998) (Briscoe, J., dissenting)." [4] *Coe v. Bell,* Nos. 00–

---

3. This opinion is an appendix to the Tennessee Supreme Court's opinion. *See Coe v. State,* 2000 WL 246425, at *2, —— S.W.3d ——, —— (Tenn. Mar.6, 2000).

4. The court finds that 28 U.S.C. § 2241 is not an appropriate basis for jurisdiction over this petition. The authority cited by the Sixth

Circuit Court of Appeals in returning the case to this court indicates that the appropriate basis for jurisdiction is 28 U.S.C. § 2254. In *In re Hanserd,* the Sixth Circuit held that the AEDPA did not bar a federal prisoner's second motion to vacate sentence under 28 U.S.C. § 2255 because petitioner's first

5323/5327/5328/5329, March 21, 2000 Order, at 5–6.

This petition was filed on March 17, 2000, so the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA")[5] apply for purposes of this court's analysis.[6] *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Harpster v. State of Ohio,* 128 F.3d 322, 326 (6th Cir.1997). In finding that this court has jurisdiction over this petition, it would appear that the Sixth Circuit determined that this present petition was not a "second or successive" petition under the AEDPA and, as such, it is not barred by the requirements of 28 U.S.C. § 2244(b)(2). This court's standard of review, however, must follow the AEDPA. *See, e.g., Brown v. O'Dea,* 187 F.3d 572 (6th Cir.1999) (finding that although first § 2254 petition was filed prior to AEDPA and second § 2254 petition was filed after AEDPA, the second petition was not barred as "second or successive" petition but denied habeas relief under § 2254(d) provision of the AEDPA).

 Under the AEDPA, federal courts must give greater deference to de-terminations made by state courts than they were required to do before the Act. *See Jones v. Jones,* 76 F.Supp.2d 850, 854 (E.D.Tenn.1999). A federal court reviewing a state court decision under the AEDPA may only grant a petition for a writ of habeas corpus where the state court proceedings:

> (1) resulted in a decision that was *contrary to,*[7] or involved an *unreasonable application of,* clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). Factual findings reached by the state court carry a presumption of correctness that the petitioner has the burden of rebutting by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner has asserted that the issue of competency is a mixed question of law and fact. (Docket No. 4 at 14, citing *Levine v. Torvik,* 986 F.2d 1506, 1514 (6th Cir.1993)) The Tennessee Supreme Court in *Van Tran* clearly held that "[a]lthough likely

§ 2255 motion was filed prior to the enactment of the AEDPA. *In re Hanserd,* 123 F.3d 922 (6th Cir.1997). While discussing the available avenue of § 2241 for the federal prisoner's motion, the court found that he could proceed under § 2255. In *Martinez–Villareal,* the Supreme Court determined that the AEDPA did not bar the petitioner's *Ford* claim in his post-AEDPA habeas petition because the first habeas petition, filed prior to the AEDPA, had been dismissed as premature. *Stewart v. Martinez–Villareal,* 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998). In the dissent in *Nguyen,* Circuit Judge Briscoe stated that the petitioner's newly-raised *Ford* claim in his § 2254 petition should not be barred by the restrictions under the AEDPA and that the petitioner should be allowed to proceed with his § 2254 petition in the district court. *Nguyen v. Gibson,* 162 F.3d 600 (10th Cir.1998) (Briscoe, J., dissenting). *Martinez–Villareal* and *Nguyen,* both § 2254 cases, do not even discuss § 2241. In light of the holdings of these cases, it appears to this court that the jurisdictional basis for Petitioner's present petition is under § 2254 and not § 2241.

5. Pub.L. No. 104–132, 110 Stat. 1214 (1996). The effective date of the Act was April 24, 1996.

6. Petitioner argues that the AEDPA does not apply to this case because application of the AEDPA to the merits of his claim would "impose retroactive effects." (Docket No. 30 at 2) However, there is no support for Petitioner's argument that the *Hanserd* retroactivity analysis that governs whether a petitioner is procedurally barred from bringing a second-in-time habeas corpus petition also applies to the merits of his claim. By finding that Petitioner's present petition was not barred under 2244(b) as a "second or successive" petition, the Sixth Circuit did not imply that the AEDPA did not govern the resolution of the merits of his claim.

7. The Sixth Circuit Court of Appeals has not yet analyzed a habeas challenge under the "contrary to" prong. *See, e.g., Ashe v. Jones,* 2000 WL 263342, at *2 (6th Cir. Feb.29, 2000) (unpublished).

based upon expert medical and mental health testimony, the ultimate question as to whether the prisoner is competent is a question of fact." *Van Tran*, 6 S.W.3d at 271. In so holding, the court cited to *Maggio v. Fulford*, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983), in which the Supreme Court treated the issue of competency to stand trial as a factual issue.[8] Since the ruling in *Maggio*, the Supreme Court, in addressing the issue of whether a question is to be treated as a factual or legal issue for purposes of § 2254(d), confirmed that it has classified as a factual issue the question of competency to stand trial.[9] *See Thompson v. Keohane*, 516 U.S. 99, 110–111, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Despite these Supreme Court rulings, the Sixth Circuit has repeatedly held that competency is a mixed question of law and fact.[10] *See e.g., United States v. Ford*, 184 F.3d 566, 581 (6th Cir.1999); *Devine v. Commonwealth of Kentucky*, 187 F.3d 635, 1999 WL 551400 (6th Cir. July 20, 1999); *Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995), *cert. denied*, 516 U.S. 1096, 116 S.Ct. 822, 133 L.Ed.2d 765 (1996). It makes a technical difference in the analysis.

If competency is a question of fact, the state court determination is entitled to the presumption of correctness, and the petitioner must rebut the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). In addition, an application for a writ of habeas corpus must be denied unless the state court decision was based on an "unreasonable determination of the facts in light of the evidence presented" at the hearing. 28 U.S.C. § 2254(d)(2).

If competency is a mixed question of law and fact, the presumption of correctness does not apply, and the analysis must be under § 2254(d)(1). *See Nevers*, 169 F.3d at 360. *See also Harpster*, 128 F.3d at 327. The Sixth Circuit has defined an "unreasonable application[ ] of clearly established Federal law, as determined by the Supreme Court" under § 2254(d)(1) to be a state court decision "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *Nevers*, 169 F.3d at 362 (citing *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir.1998)).[11]

---

**8.** In a concurring opinion, Justice White noted that prior Supreme Court precedent has treated the "ultimate question whether a defendant is competent to stand trial as at least a mixed question of law and fact." *Maggio*, 462 U.S. at 118–19, 103 S.Ct. 2261 (citing *Drope v. Missouri*, 420 U.S. 162, 174–75, 175 n. 10, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) and *Pate v. Robinson*, 383 U.S. 375, 385–86, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)). Justice White concurred in the judgment reversing the appellate court's finding that the state court's determination that the petitioner was competent to stand trial, but stated that he "cannot agree with the Court that competency is a question of historical fact...." *Id.* at 119, 103 S.Ct. 2261.

**9.** The Supreme Court stated that while these factual issues "encompass more than 'basic, primary, or historical facts,' their resolution depends heavily on the trial court's appraisal of witness credibility and demeanor.... This Court has reasoned that a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer 'presumptive weight.'" *Thompson*, 116 S.Ct. at 465.

**10.** Mixed questions of law and fact "are those decisions which require the application of a legal standard to fact determinations." *Nevers v. Killinger*, 990 F.Supp. 844, 850 (E.D.Mich.1997) (citing *Thompson v. Keohane*, 516 U.S. 99, 109–11, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).

**11.** The court looks to the Sixth Circuit's application of this standard for guidance. In *King v. Trippett*, 192 F.3d 517, 521 (6th Cir.1999), the court found that the state court's upholding of a conviction after the prosecutor presented a witness who had failed a polygraph test, without disclosing that the witness had ever taken a polygraph test, was not "unreasonable." *See also Combs v. Coyle*, 205 F.3d 269 (6th Cir.2000) (reversing district court's denial of habeas relief on ineffective assistance of counsel claim where defense counsel failed to object to prosecutor's comment on the defendant's pre-arrest silence after invoking his Fifth Amendment privilege against self-incrimination); *Barker v. Yukins*, 199 F.3d 867 (6th Cir.1999) (reversing district court denial of habeas relief, finding "unreasonable" application of federal law where

As a practical matter, for purposes of this case, this court need not decide whether to analyze the state court determination under the "fact" standard or under the "mixed question of law and fact" standard. This is not a close case, and the result would be the same under either standard. In the interest of brevity, the analysis will be conducted only under the "mixed question of law and fact" standard, as the Sixth Circuit and the petitioner would have it be.

## DISCUSSION

### I. Petitioner's Claims for Relief

#### A. Petitioner is not competent to be executed.

■ The trial court decided on February 2, 2000 that Robert Glen Coe "is presently mentally competent to be executed." (Trial Ct.Op. at 28)[12] On March 6, 2000, the Tennessee Supreme Court issued a 26–page opinion which concluded:

> Having carefully reviewed *de novo* each of the legal claims raised by the appellant, a majority of this Court concludes that none have merit. In addition, each member of this Court has thoroughly reviewed the record in this appeal and a majority concludes that the evidence fully supports and does not preponderate against the trial court's finding that the appellant is presently competent to be executed. Accordingly, we affirm the decision of the trial court.

*Coe v. State*, 2000 WL 246425, at *35, —— S.W.3d ——, —— (Tenn. Mar.6, 2000). The "majority" consisted of four members of the five-member court.[13]

In structuring the manner in which the question of the competency of a prisoner to be executed is to be determined, the Tennessee Supreme Court held, in consonance with Justice Powell's concurring

opinion in *Ford*, and as many state statutes provide, that at the hearing the prisoner is presumed to be competent to be executed. *Van Tran*, 6 S.W.3d at 270. The prisoner must overcome this presumption of competency by a preponderance of the evidence. *Id.* at 270–71. At the hearing, the prisoner has the opportunity to be heard and to present evidence relevant to the issue of competency, and he or she is entitled to cross-examine the State's witnesses. *Id.* at 271. The rules of evidence "should not be applied to limit the admissibility of reliable evidence that is relevant to the issue of the prisoner's competency." *Id.*

It is important to note that in *Ford*, where the Supreme Court articulated that the Eighth Amendment prohibits the State from executing a prisoner who is insane, the Court held deficient a Florida procedure that afforded prisoners about to be executed no procedural safeguards. Under that procedure, when the governor was informed that a prisoner about to be executed might be insane, the governor appointed three psychiatrists who examined the prisoner at the same time and made a report to the governor. The governor then determined whether the prisoner had the mental capacity to be executed. *Ford*, 477 U.S. at 412, 106 S.Ct. 2595. The Supreme Court found this process deficient because: 1) the prisoner was not allowed to present any material relevant to his sanity to be executed; 2) the prisoner was given no opportunity to challenge the opinions of the state-appointed psychiatrists or cross-examine them in any way; and 3) the entire process and decision making was lodged in the governor. Having found the Florida process entirely devoid of due process, but without providing much positive guidance, the court stated:

state supreme court found harmless error in trial court's failure to instruct jury that the defendant was justified in using deadly force if acting in self-defense).

12. The trial court decision is attached to this court's memorandum opinion as an appendix and is referenced herein as "Trial Ct.Op."

13. Justice Birch dissented solely because the procedures used in *Coe* were those which he disapproved as violative of due process in his dissent in *Van Tran*. He did not reach the merits in *Coe*.

We do not here suggest that only a full trial on the issue of sanity will suffice to protect the federal interests; we leave to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences. It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity.... Other legitimate pragmatic considerations may also supply the boundaries of the procedural safeguards that feasibly can be provided.

*Ford,* 477 U.S. at 416–17, 106 S.Ct. 2595.

The *Ford* decision was issued in 1986. The Tennessee legislature never enacted a statutory scheme for the determination of the competency of prisoners to be executed. *See Van Tran,* 6 S .W.3d at 263. Therefore, with the first execution in 40 years approaching, the Tennessee Supreme Court in November 1999 promulgated a procedure in *Van Tran* to fill the void.

In *Van Tran,* the Supreme Court prescribed a strict timetable for the determination of a prisoner's competency to be executed. *Id.* at 273. This quick pace is absolutely essential because the issue of competency to be executed is not ripe "until execution is imminent," but must be made "in proximity to the execution." *Id.* at 263–64 (citations omitted).[14]

The standard for competency to be executed in Tennessee is set out in *Van Tran.* A prisoner may not be executed if he or she "lacks the mental capacity to understand the fact of the impending execution and the reason for it." *Id.* at 266. This was the central issue in the hearing held before the trial court and the context within which all of the proof must be analyzed.

At the hearing, the court heard live testimony from four psychiatrists and two neuropsychologists. Petitioner's medical records going back to at least 1975 were made available to the experts. *See* Docket No. 12, Trial Exs. 1, 4, 10, 11.

The Tennessee Supreme Court opinion in *Coe* gives a comprehensive and accurate summary of the medical testimony which this court adopts herein and will not attempt to replicate. *See Coe v. State,* 2000 WL 246425, at *2–7, —— S.W.3d at —— ——. This court has done its own review of all of the testimony and will summarize herein the additional matters considered pertinent to the determination of petitioner's competency to be executed.

### 1. *Dr. James R. Merikangas*

Dr. Merikangas was the first witness for the petitioner. He was qualified to testify as an expert witness in the fields of neurology, neuropsychiatry and psychiatry. (Docket No. 12, Tr. 81) He is a lecturer in psychiatry at Yale University School of Medicine and has a private practice in Woodbridge, CT. (Trial Ex. 2) He has assisted 117 death row inmates in their appeals and has been retained by the prosecution in only one case. (Tr. 213–14) He conducted a physical and a neurological examination of Coe on January 13, 2000. (Tr. 88; Trial Ex. 2) The examination lasted one and one-half hours. (Tr. 182)

Dr. Merikangas' testimony is an excellent example of the Supreme Court's pronouncement in *Ford* that in competency hearings "the 'evidence' will always be imprecise." *Ford,* 477 U.S. at 417, 106 S.Ct. 2595. Dr. Merikangas testified variously that:

> "In my opinion, Mr. Coe is aware of his impending execution and the reasons for it." (Tr. 162)

---

**14.** These considerations have been the driving force behind this court's setting aside all other business in order to review the lengthy record in this case and render a prompt decision. Perhaps it is the impracticality of this situation that caused Justice O'Connor in *Ford* to state that "federal courts should have [no] role whatever in the substantive determination of a defendant's competency to be executed." *Ford,* 477 U.S. at 427–28, 106 S.Ct. 2595.

"I think he lacks the mental capacity to understand the execution and reasons for it." (Tr. 190)

"I agree that he is aware of an execution. My point is he does not have the mental capacity to understand." (Tr. 207)

"I agree ... that he realizes that he was sentenced to die for the murder of a young girl". (Tr. 208)

"[H]e lacks the mental capacity to understand why he is being put to death. To him it is not a punishment." (Tr. 243)

Dr. Merikangas diagnosed Coe as a brain-damaged chronic paranoid schizophrenic. (Tr. 168) He opined that, based upon those diagnoses, Coe will be incompetent to be executed on March 23, 2000. (Tr. 168) He further predicted, "I think he's incompetent now, but I think that as the time draws nigh, he will be blatantly and clearly to everyone incompetent." (Tr. 163) Importantly, in connection with his diagnosis, Dr. Merikangas stated that, "His thought that people are out to get him, though, is not a delusion. I mean that's reality ." (Tr. 113) He further stated, "you can be schizophrenic and be competent" (Tr. 169), and "there are people who look like raving mad men who are competent to be executed." (Tr. 165) He conceded that his fellow defense expert, Dr. Kenner, did not diagnose Coe as a paranoid schizophrenic. (Tr. 195) In commenting upon Dr. Kenner's diagnosis of dissociative identity disorder ("DID"), Dr. Merikangas stated, "the dissociation means you're no longer in contact with your usual reality, and that's something that can happen to all kinds of people under stress, generally under stress." (Tr. 122)

Given Dr. Merikangas' credentials, his defensiveness and testiness on cross-examination are puzzling. When the state's counsel asked him for help in pronouncing a difficult medical term, Dr. Merikangas responded, "I'm not going to help you, sir." (Tr. 221) *See also* Tr. 251 ("So ask a question if you want") and Tr. 253–54 ("I think it's bizarre behavior to have a man locked in a little room and just note these things for you to infer that that means something.")

The trial court found that Dr. Merikangas' inconsistent statements and uncooperativeness on cross-examination "somewhat diminished" his credibility. (Trial Ct.Op. at 3) Under *Van Tran*, the trial court is mandated to assess the credibility of the expert witnesses. *See Van Tran*, 6 S.W.3d at 271. Having viewed the videotapes of Dr. Merikangas' testimony and read the transcript of that testimony, this court comes away with a similar impression.

### 2. *Dr. William D. Kenner*

Dr. Kenner was the next expert witness for Coe. He qualified as an expert in psychiatry. (Tr. 286) He teaches at Vanderbilt University School of Medicine and St. Louis Psychoanalytic Institute and has a private psychiatry practice in Nashville, Tennessee. (Trial Ex. 5) He has testified for both the prosecution and the defense in criminal trials (Tr. 281–82) and has done many competency evaluations, usually for the court. (Tr. 284)

Dr. Kenner evaluated Coe on four occasions—December 22, 1999, January 10, 2000, January 11, 2000, and January 12, 2000. (Tr. 290) On two of those occasions, Dr. Kenner found Coe competent to be executed, and on two he found Coe incompetent to be executed. Dr. Kenner's evaluation highlights a concern expressed by Justice O'Connor in her opinion in *Ford*:

> Regardless of the number of prior adjudications of the issue, until the very moment of execution the prisoner can claim that he has become insane sometime after the previous determination to the contrary.... These difficulties, together with the fact that the issue arises only after conviction and sentencing, convince me that the Due Process Clause imposes few requirements on the States in this context.

*Ford*, 477 U.S. at 429, 106 S.Ct. 2595.

Dr. Kenner found Coe not competent to be executed in his first interview on De-

cember 22, 1999 because, "he was unable to understand the reason for his execution." (Tr. 299) On January 10, 2000, Dr. Kenner found him "improved significantly" and stated that "he was competent to be executed at that time." (Tr. 302) On January 11, 2000, Dr Kenner once again found Coe incompetent to be executed because he was "dissociated." It was as a result of this interview that Dr. Kenner diagnosed Coe with DID.

DID causes a person to go into another identity when "faced with a significant stress." (Tr. 327) It sometimes eventually goes away and can be treated by therapy in a safe environment. (Tr. 343–44) It takes an average of six to seven years to diagnose (Tr. 391), but with Coe it took over twenty-five years to diagnose, even though he has been in institutional settings of one kind or another for almost that entire period of time. (Tr. 367, 794)

What caused Coe to "dissociate" into another identity during the January 11 interview was a letter he had just received. (Tr. 323, 367) The letter was from Michael Saripkin, an inmate at another institution. The letter threatens to have Coe killed by Saripkin's friends at Riverbend if Coe is not executed. (Trial Ex. 6) One paragraph of the letter describes Saripkin's desired rape of Coe in graphic and obscene detail. Dr. Kenner explained that this letter caused Coe to go into his other identity because it "describes things that are very similar to what actually happened to Robert in childhood." (Tr. 326) Coe was apparently subjected to significant sexual abuse by his father, and it was during these times that he would "dissociate" into another identity so that he could make believe that he was not suffering the abuse that he actually was. (Tr. 326–27; Trial Ex. 4) Dr. Kenner went on to state that people with DID "typically dissociate around specific issues." (Tr. 366) The issues for Coe are "somebody threatening

him, threatening his physical integrity, threatening to abuse him in some way." (Tr. 366) All of this is logical, sensible and comprehensible. It is Dr. Kenner's next step or "leap" about which this court, the trial court and the Tennessee Supreme Court all are somewhat skeptical.

Dr. Kenner opined that at the time of execution, Coe would be incompetent to be executed because he would "dissociate;" the execution would represent a "threat against his physical integrity" that would cause the dissociation. (Tr. 326–328) This prediction does not ring true. There is much proof in the record that Coe looks forward to his execution, looks forward to dying and sees it as a release. (Tr. 728–29, 1087, 1109) There is proof that he wants his lawyers to stop fighting the competency fight and allow him to be executed. (Tr. 362) These attitudes on his part make Dr. Kenner's equating the approaching execution to the threatening Saripkin letter invalid. The letter threatened the kind of graphic sexual abuse allegedly suffered by Coe at the hands of his father as a child,[15] which may have caused him to create another identity into which to "dissociate" when under that kind of stress. Dr. Kenner's own words reinforce this court's skepticism of Dr. Kenner's conclusion that the approaching execution will cause Coe to "dissociate." After testifying that psychiatry is an "art" as opposed to "an exact science," Dr. Kenner stated:

I think what we're looking at here, though, is that if you look at the kind of stressers, for example, someone who has been in combat and who has dissociative identity disorder as a result of that, if you put them in a situation that reminds them of combat, then it's going to bring about a recurrence of those symptoms, because those symptoms spare them from having to experience first hand the

**15.** Coe told Dr. Matthews that his father was abusive, but did not extend this to sexual

abuse. (Tr. 723)

anxiety and pain that come with feeling like they're back in combat.

(Tr. 396)

Dr. Kenner found Coe competent to be executed during his last visit on January 12, 2000 and stated further, "He's competent to be executed on a good day." (Tr. 361–62) Dr. Kenner further stated that you could have a mental illness and still be competent to be executed. (Tr. 295) [16]

### 3. *Dr. Daryl Bruce Matthews*

Dr. Matthews testified as an expert witness in forensic psychiatry for the State. (Tr. 701) He confines his practice to forensic psychiatry and has been hired more by the defense than by the prosecution. (Tr. 802) He teaches at the University of Hawaii School of Medicine and is co-director of the forensic psychiatry training program at Tripler Army Medical Center in Hawaii. (Tr. 694–95)

Dr. Matthews conducted a lengthy interview with and evaluation of Coe on January 8, 2000 over the course of nearly five hours. (Tr. 702) He concluded that Coe has "the capacity to understand the pendency of his execution and the reasons for it." (Tr. 703) "He's aware that he was arrested for murder and he's aware that he's alleged to have killed a girl." (Tr. 736) Coe told him in the interview, "The judge said I was guilty. The judge did say I was going to die. They say the reason is murder. The judge said that's the reason." (Tr. 736) He further testified that "Mr. Coe understands that he is going to be executed and I believe he understands the reason for it. . . . I think he is perfectly capable of understanding both things, and I think he demonstrated it yesterday [in court] and demonstrated it over our exam and demonstrated it over the years." (Tr. 798–799)

Dr. Matthews disagreed with Dr. Merikangas' diagnosis that Coe is schizophren-

ic. (Tr. 786–789). He pointed out that Dr. Herb Meltzer, "one of the foremost experts on schizophrenia in the United States" who was retained by the defense to examine Coe, found him not to be schizophrenic. (Tr. 790) Dr. Matthews expressed skepticism at Dr. Kenner's diagnosis of DID based upon the fact that Coe has been under almost continuous observation in various institutions since 1975 without this diagnosis being made. (Tr. 794)

Dr. Matthews did not find Coe to be psychotic at the time he examined him but did not "foreclose the possibility that he will be psychotic in the future." (Tr. 820) With his borderline personality, the stress of his impending execution "may make it possible" for him to become psychotic. (Tr. 821) However, it is Dr. Matthews' opinion that it is not possible to predict that Coe will become incompetent as his execution approaches.

I think that there are individuals that I could look at now who would be incompetent now, who I could predict would be incompetent at some future time and possible [sic] there would be individuals who would be competent now who you could predict would be incompetent at some future time. So for example, if there was someone who was really a schizophrenic person who had been incompetent in some way and was effectively treated with medication to make that person competent, and then they were going off the medication, and you might predict that as a result of being off that medication, that they might be incompetent. But an individual with a personality disorder who has not been clearly incompetent or psychotic in the past, and someone with these kinds of features, I don't believe you can predict

---

**16.** This is an extremely important conclusion, in that so much of the testimony at the hearing concerned which mental illness diagnosis, if any, was accurate and whether or not Coe was "malingering" (faking) mental illness. It also undercuts the petitioner's assertion that the trial court's decision is defective because it does not settle upon exactly which diagnosis Coe carries.

that they would be incompetent. I think that that's an over prediction.

(Tr. 842–43)

Dr. Matthews diagnosed Coe with anti-social personality disorder. (Tr. 754) and borderline personality disorder. (Tr. 772–774) [17]

### 4. *Dr. Daniel A. Martell*

Dr. Martell testified as an expert forensic neuropsychologist for the State. (Tr. 885) He does private forensic consultation for both defense and prosecution, but the majority of his work is for the prosecution. (Tr. 993) On January 8 and 9, 2000, he gave Coe a battery of tests for four and one-half hours, and he also watched the evaluation of Coe by Dr. Matthews for nearly five hours. (Tr. 887)

After Dr. Martell's interview with Coe and Dr. Matthews' interview with Coe, Dr. Martell concluded "that he does understand the fact of impending execution, and that he does understand the reason for it. Although he takes issue with his guilt." (Tr. 926) He related that Coe "was able to state that he had been sentenced to die for the murder of a young girl." (Tr. 927)

### 5. *Dr. James Stanley Walker*

Dr. Walker testified in rebuttal for the petitioner as an expert in forensic neuropsychology. (Tr. 1069) He is a clinical assistant professor of neurology at Vanderbilt University Medical Center. (Tr. 1064) At Dr. Meltzer's request (Tr. 1069), on December 23 and 24, 1999, Dr. Walker administered many of the same tests that Dr. Martell had administered and conducted a two or three hour interview with Coe. (Tr. 1072, 1082, Trial Ex. 14)

Dr. Walker diagnosed Coe with pseudologicafantastica, a symptom of mental illnesses like borderline personality disorder, but not of schizophrenia. (Tr. 1090–91) With this syndrome, people are unable to inhibit representing themselves to others. (Tr. 1076) Dr. Walker did not find any

evidence of psychosis in Coe when he interviewed him or in his medical records going back to 1996. (Tr. 1107) Dr. Walker's self-described "careful interview" of Coe (Tr. 1108) revealed:

> He is aware that his execution is impending. He demonstrated an awareness of execution as a penalty imposed by society for certain crimes.... He indicated understanding of the fact that his sentence has been imposed due to the conviction for a crime.... His thinking appeared logical during this interview and his manner was somewhat less flippant and superficial.... Cognitively, Mr. Coe understands the concept of the death penalty in the abstract and its existence as a penalty for misdeeds. He retains memories of his trial and legal proceedings since his trial and he can explain many or most of the issues involved. He is aware that he's been accused of a crime, and the death penalty has been imposed for that crime.... In sum, while his abilities to think, understand, and perhaps even to monitor or regulate his behavior in given situations may reflect some impairment, he still has a basic understanding of his situation and the capacity to act in his best interest if he chooses to do so.

(Tr. 1108–1112) Dr. Walker expects that Coe will "deteriorate" as the execution approaches but it is impossible to predict in what way he will deteriorate or to say necessarily that he will become psychotic. (Tr. 1112) He disagrees with Dr. Kenner's prediction that Coe will dissociate into a psychosis as the execution approaches. (Tr. 1101) Dr. Walker's report states:

> With regard to his own prediction of his behavior, I also questioned Mr. Coe closely about the future. I went into some unpleasant, stressing detail to test his tolerance for imagining the details of his execution, but elicit no concern on his part that he might deteriorate nor

---

17. Dr. Matthews witnessed Coe's "motivated, voluntary, conscious, highly manipulative display" in the courtroom and stated that it was "classic for people with borderline personality disorder to do this kind of thing." (Tr. 781)

did I observe any deterioration in response to my interview.

(Trial Ex. 14 at 9)

### 6. *Dr. John W. Pruett*

Dr. Pruett, a psychiatrist who treated Coe at Riverbend from 1994–97, also testified for the petitioner in rebuttal. He was qualified to testify as an expert in psychiatry. (Tr. 1042–43)

Dr. Pruett did not give an expert opinion about Coe's competency to be executed. He testified that Dr. Kenner's diagnosis of DID "makes sense." (Tr. 1034) He testified that Coe could be malingering "in some aspects and still be mentally ill." (Tr. 1040) He testified that schizophrenia can be confused with DID (Tr. 1041) but that Dr. Merikangas' diagnosis of schizophrenia was "reasonable" based upon his report. (Tr. 1043) He further testified that Coe's brain abnormalities are consistent with schizophrenia and "a lot of other conditions too." (Tr. 1044)

For this court to grant this application for a writ on the ground that Coe is not competent to be executed, this court must find the conclusions reached by the trial court and the Tennessee Supreme Court as to Coe's competency to be executed to be "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that [they are] outside the universe of plausible, credible outcomes." *Nevers,* 169 F.3d at 362. This court cannot make that finding and, therefore, this ground for the petition must be denied.

### B. *Petitioner was denied due process under the Sixth, Eighth and Fourteenth Amendments by the state courts.*

For any of these due process claims to be a ground for the granting of a writ of habeas corpus by this court, this court must find that the Tennessee Supreme Court's decision adjudicating them was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This court finds that none of

petitioner's claims meet that standard for the reasons discussed hereafter. His allegations are many and detailed. For ease of cross-reference to the petition (Docket No. 1), the numbering system used in the petition will be used.

62. *The trial court did not conduct a "fully adversarial" trial on Coe's competency.*

■ *Ford* states that, in a proceeding to determine a prisoner's competency to be executed, the "factfinder must 'have before it all possible relevant information about the individual defendant whose fate it must determine.'" *Ford,* 477 U.S. at 413, 106 S.Ct. 2595 (citations omitted). The Court went on to state: "The stakes are high, and the 'evidence' will always be imprecise. It is all the more important that the adversary presentation of relevant information be as unrestricted as possible." *Id.* at 417, 106 S.Ct. 2595. In specifying that a full, adversary proceeding is not required, the Court stated: "We do not here suggest that only a full trial on the issue of sanity will suffice to protect the federal interests; we leave to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Id.* at 416–17, 106 S.Ct. 2595.

The Tennessee Supreme Court, in its effort to set out procedures for dealing with the competency of prisoners to be executed in conformance with the *Ford* standard, provided that the basics of procedural due process would apply to the hearing but specifically held, "... rules of evidence should not be applied to limit the admissibility of reliable evidence that is relevant to the issue of the prisoner's competency." *Van Tran,* 6 S.W.3d at 271.

These parameters informed the trial judge's rulings on the admissibility of evidence and conduct of the hearing. However, unlike the manner in which many trial judges conduct bench trials and would have conducted this proceeding, Judge Colton asked very few questions of the witnesses, scrupulously sought out the positions of both sides before ruling on contested matters and did not intrude on the

presentation of the case by the lawyers. *See* Docket No. 12, Trial Transcript and videotapes. His clear goal, however, was to receive for his own consideration all evidence that bore any relevance to the determination of the petitioner's competency to be executed, as required by both the United States Supreme Court and the Tennessee Supreme Court.

The trial was as "fully adversarial" as it needed to be under *Ford* and *Van Tran.*

*63–64. The trial court violated due process by forcing the disclosure of reports and other data generated by petitioner's court-appointed experts, which was then relied upon by the Court in making its decision, despite the fact that much of it was never introduced into evidence at the hearing.*

■ The Tennessee Supreme Court dealt with these issues at length in its opinion upholding the trial court's decision, see *Coe v. State,* 2000 WL 246425, at *17–19, —— S.W.3d at ——–——, and this court will not repeat its marshaling of the facts and reasoning.

In finding that the disclosure of these expert reports did not violate due process, the court stated that "[s]ince the only issue in a competency proceeding is the prisoner's mental state, full reciprocal disclosure of experts appointed to assist either party does not offend basic notions of due process." *Coe v. State,* 2000 WL 246425, at *18, —— S.W.3d at ——.[18] It is clear that the disclosure of expert reports was contemplated in *Van Tran* and in *Ford.* As

stated in *Van Tran,* "the prisoner and the State should freely disclose to each other all information relating to the prisoner's competency as this proceeding may be, in a very real sense, the last avenue of reprieve available to an inmate sentenced to death." *Van Tran,* 6 S.W.3d at 270 n. 14. In *Ford,* the majority noted that, in light of the significant interests at stake, "[i]t is all the more important that the adversary presentation of relevant information be as unrestricted as possible. Also essential is that the manner of selecting and using the experts responsible for producing that 'evidence' be conducive to the formation of neutral, sound, and professional judgments as to the prisoner's ability to comprehend the nature of the penalty." *Ford,* 477 U.S. at 417, 106 S.Ct. 2595. As for the contention that the trial court improperly considered the reports of experts who did not testify, this claim has no merit. All evidence relevant to the issue of the petitioner's competency to be executed should have been considered. *See infra* discussion relating to ¶ 68.

The trial court record reveals additional support for denying the petition on this ground. Petitioner's expert witness, Dr. Merikangas [19] testified at length on direct examination by petitioner's lawyer about Dr. Meltzer's report, thereby placing it in evidence through his testimony and providing the trial court with the petitioner's interpretation of Dr. Meltzer's findings. (Tr. 152–58; *see also* Tr. 226–28) Dr. Merikangas also commented upon aspects of Dr. Auble's report (Tr. 208),[20] as did Dr.

---

**18.** The Tennessee Supreme Court cited as support two state statutes that have essentially codified this full disclosure of expert reports for purposes of competency proceedings. *See* Ariz.Rev.Stat.Ann. § 13.4022(C) ("[t]he parties shall also disclose to the appointed experts and to each other the names and addresses of any other previously. undisclosed mental health experts who have examined the prisoner and the results of the examinations"); Tex.Crim.P.Code Ann. § 46.04(j) (in competency proceeding, prisoner "waives any claim of privilege with respect to, and consents to the release of, all mental health and medical records relevant to whether the [prisoner] is incompetent to be executed").

**19.** Dr. Herbert Meltzer, a "foremost expert" in schizophrenia, was hired to be an expert witness for Coe. He did not find Coe to be schizophrenic and was not called to testify. (Tr. 790)

**20.** From the trial court transcript, it appears that all of the expert witness reports and data were being kept on a table in or near the courtroom for easy access by all counsel and experts during the trial. This included those of experts not called to testify. Some were marked as specific numbered exhibits at trial, but all of this material was available for the use of the trial court and was part of the

Matthews (Tr. 747, 750) and Dr. Martell (Tr. 888).

The petitioner's due process rights were not violated by the disclosure of the expert reports and the trial court's consideration of reports of those experts who did not testify.

65. *The trial court precluded full consideration of evidence relevant to the competency determination.*

a–1. *The petitioner was unable to present expert testimony concerning malingering because the Court denied his motion for a continuance made at the start of the hearing.*

The Tennessee Supreme Court ruled on this issue, see *Coe v. State,* 2000 WL 246425, at *21, —— S.W.3d at ——, and petitioner has not met the standard of review that would cause this court to sustain the petition on this ground.

As to the issue of whether Petitioner was malingering mental illness in order to avoid execution, the trial court correctly noted that the "the ultimate determination of Petitioner's competency for execution is a legal issue, not a mental health issue, and the ultimate question before this Court is not whether Petitioner is malingering mental illness, but rather, does Petitioner have the mental capacity to understand the fact of his impending execution and the reason for it." (Trial Ct.Op. at 23) *See also Coe v. State,* 2000 WL 246425, at *21, —— S.W.3d at ——. Coe's own expert, Dr. Kenner, endorsed this view in his testimony. He answered, "Sure" to the question, "[Y]ou could have a mental illness and be competent to be executed or not be competent to be executed...." (Tr. 295)

Furthermore, it is worth noting that petitioner's counsel was seeking a continuance because he was seeking to hire the "foremost experts" nationally in the field of malingering to testify on petitioner's behalf, and they were not available on record in the case. *See* Tr. 171; *Coe v. State,* 2000 WL 246425, at *n. 13, —— S.W.3d at

short notice. At any rate, Dr. Matthews (at length) and Dr. Pruett both testified in rebuttal for Coe on the issue of malingering. (Tr. 17)

m–s. *The Court denied a continuance sought by the petitioner so that he could secure the presence of Dr. Deal, a psychiatrist who once had treated him in prison.*

■ Another ground for the continuance motion at the beginning of the hearing was so that prison psychiatrists who had treated Coe in the past could be located and subpoenaed to come and testify that he was clearly mentally ill and not malingering. Petitioner's counsel specifically mentioned two individuals, one who lived in Mississippi and was unavailable, and one who had agreed to come and testify. (Tr. 15–16) Dr. Deal, the witness for whose presence the petitioner needed a continuance, saw the petitioner in prison for only a six-month period in 1989. (Docket No. 6, Ex. 1) Dr. Pruett, a Board certified psychiatrist who treated the petitioner at Riverbend Penitentiary from 1994–97, testified in rebuttal for the petitioner, shoring up opinions advanced by Drs. Kenner and Merikangas and opining, "You could be malingering in some aspects and still be mentally ill." (Tr. 1040)

The denial of the motion to continue did not violate the petitioner's due process rights. *See supra* at ¶ 65a–1.

t–v. *The trial court violated due process by allowing the state's expert witnesses to remain in the courtroom to hear the testimony of the petitioner's experts when petitioner's experts did not have the same opportunity and by denying a continuance so that petitioner's experts could testify in rebuttal concerning Coe's disruptive behavior during the hearing.*

The Tennessee Supreme Court has correctly ruled on these issues, see *Coe v. State,* 2000 WL 246425, at *26–27, 32, —— S.W.3d at —— – ——, ——, and the peti-
——.

tioner has not met the standard that would require this court to sustain his petition on this ground. *See also infra,* discussion relating to ¶ 68.

w–ab. *Had a continuance been granted and Drs. Kenner and Merikangas been allowed to testify in rebuttal, they would have provided the court with additional important testimony.*

Most of the proffered additional testimony of Drs. Kenner and Merikangas, which is also a ground for petitioner's motion for evidentiary hearing, is supplemental closing argument. Most of the assertions are already contained in the record of the case, and it is clear that the trial judge carefully reviewed all of the medical evidence and testimony before issuing his opinion.

Accordingly, the denial of the continuance was not unreasonable or a violation of due process.

ac–at. *The trial court should have appointed a pharmacologist/sexual abuse expert and a radiologist as additional expert witnesses.*

The Supreme Court correctly held that the petitioner was only entitled to the expert witnesses who were appointed, see *Coe v. State,* 2000 WL 246425, at *17, —— S.W.3d at ——. In addition, the proposed testimony which the petitioner proffers from these two experts is either cumulative of what was already admitted at the hearing and in the medical information provided to the court or irrelevant to the competency issue.

The failure to appoint these additional experts did not deny the petitioner due process.

au–aw. *The denial of a continuance to secure a handwriting expert violated due process.*

As stated by the Supreme Court in its ruling on this issue, the trial court made it clear that he was not relying upon statements allegedly made by Coe in a letter [21] to the victim's mother in making his competency determination. *See Coe v. State,* 2000 WL 246425, at *21, —— S.W.3d at ——. Therefore, this claim is without merit.

ax.–bc. *Petitioner was unable to present additional other evidence because of the "truncated time frame."*

Specifically, petitioner complains that due process was violated because he was not able to present the testimony of other psychiatrists who had treated him over the years. However, petitioner's medical records dating back to at least 1975 were made available to all experts who testified, and there was lengthy testimony concerning his medical and mental health history. In addition, he was able to call as a witness in rebuttal Dr. John Pruett, a Board certified psychiatrist who had treated Coe at Riverbend from 1994–97.

Coe claims that he would have liked to have presented the testimony of other inmates and/or guards who had contact with him while in prison and who might have testified to behavior which they witnessed consistent with the diagnoses given to Coe by Drs. Kenner and Merikangas. However, petitioner was able to present the testimony of inmate Steve Henley, who has apparently been housed next to or close to Coe for 15 years. (Tr. 672) Henley was allowed to testify in response to questions about Coe becoming "disoriented" or acting "bizarre." (Tr. 679–682)

Petitioner complains of not being able to present testimony from family members, but petitioner's counsel made the decision not to call family members at the hearing.

---

**21.** The state's handwriting expert was unable to provide a sufficient foundation for the admissibility of the letter, *see* Tr. 443–44, so Coe did not need an expert of his own. Moreover, the letter was admissible without any expert testimony. Petitioner's own witness, Steve Henley, the inmate who occupies the cell next

to him at Riverbend Penitentiary, testified that the letter was in Coe's handwriting (Tr. 684–85) and that he helped him compose it. (Tr. 674–76) The letter appears relevant because it evidences the writer's awareness that he is about to be executed for the murder of Mrs. Stout's daughter. *See* Trial Ex. 8.

(Tr. 463–64) The petitioner's aunt's testimony concerning symptoms of brain damage would have been cumulative; Dr. Merikangas testified at length as to the physical and psychiatric indications of the petitioner's brain damage. Testimony from another inmate concerning petitioner's failure to recognize him on occasion would also have been cumulative to other testimony at the trial.

Throughout, the trial court made it clear that he would allow in any relevant proof that the petitioner wished to introduce:

> Well, I'm going to allow it, if they want, if they want to put it in—not going to keep you all from putting in any proof that you think is relevant.

(Tr. 464) Granting continuances to secure the additional proof catalogued here by the petitioner was not mandated by due process.

66. *The trial court applied an incorrect standard of proof.*

In *Van Tran*, the Tennessee Supreme Court set forth the procedures to be followed in litigating the competency to be executed issue, stating that "in the wake of *Ford*, this Court has an affirmative constitutional duty to ensure than no incompetent prisoner is executed." *Van Tran*, 6 S.W.3d at 265. The court looked to *Ford* for guidance in establishing the standard of proof to be used in state proceedings. While Petitioner appears to argue that, in *Van Tran*, the Tennessee Supreme Court "articulated varying standards" for the proof required to establish competency to be executed, this court finds that the Tennessee Supreme Court in *Van Tran* followed Justice Powell's concurrence in *Ford*: the "Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." [22] *Ford*, 477 U.S. at 422, 106 S.Ct. 2595. *Van Tran* clearly held that it was adopting the "cognitive test" and articulated this test as follows: "under Tennessee law a prisoner is not competent to be executed if the prisoner lacks the mental capacity to understand the fact of his impending execution and the reason for it." [23] *Van Tran*, 6 S.W.3d at 266.

Petitioner argues that the "cognitive test," articulated in *Van Tran* and based on Justice Powell's concurrence in

---

**22.** Petitioner argues that the state court applied an incorrect standard because the state court only required that Petitioner have an "awareness" or "knowledge" of his impending execution and the reasons for it, rather than a "comprehension of the sentence and its implications." (Docket No. 1 at 44–48) This argument lacks merit. Petitioner's argument that "comprehension" is required is based on the statement in the majority opinion in *Ford* that "[i]t is no less abhorrent today than it has been for centuries to exact in penance the life of one whose mental illness prevents him from *comprehending* the reasons for the penalty or its implications." *Ford*, 477 U.S. at 417, 106 S.Ct. 2595 (emphasis added).

Despite this language, the test set forth in Justice Powell's concurrence comports with due process. In his concurring opinion, Justice Powell uses a variety of words to clarify the standard by which competency to be executed is to be evaluated. He first states that there is no dispute as to the need "to require that those who are executed *know* the fact of their impending execution and the reason for it." *Id.* at 422, 106 S.Ct. 2595 (emphasis added). In the next sentence, in further elucidating this standard, he states that this standard "defines the kind of mental deficiency that should trigger the Eighth Amendment prohibition" and "[i]f the defendant *perceives* the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. And only if the defendant is *aware* that his death is approaching can he prepare himself for his passing." *Id.* at 423, 106 S.Ct. 2595 (emphasis added). Then in the next sentence, Justice Powell states his holding that "the Eighth Amendment forbids the execution only of those who are *unaware* of the punishment they are about to suffer and why they are to suffer it." *Id.* (emphasis added).

**23.** In *Ford*, Justice Marshall, speaking for the majority of the Court, did not define what would constitute insanity in the context of execution. In his concurrence, Justice Powell indicated that he wrote separately in part because with respect to the "meaning of insanity in this context, ... [t]he court's opinion does not address the first of these issues...." *Ford*, 477 U.S. at 418, 106 S.Ct. 2595.

*Ford,* is not the proper test because "this is a minimalist standard which is wholly inconsistent with a long history of competency and sanity jurisprudence." [24] (Docket No. 1 at 45) In Petitioner's view, the proper test to be applied is the test for competency used at common law and at all other stages of criminal proceedings.[25] (Docket No. 1 at 45–8) The standard for competency to be executed advanced by Petitioner requires that a prisoner have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Petitioner desires this higher standard, but Supreme Court law clearly does not mandate it.

As catalogued in *Van Tran,* many other states have adopted the "cognitive test" for competency to be executed. *See Van Tran,* 6 S.W.3d at 265. *See also* Ariz.Rev. Stat. § 13–4021 ("unaware that he is to be punished for the crime of murder or that he is unaware that the impending punishment for that crime is death"); Fl .Stat.Ann. § 922.07 ("whether he or she understands the nature and effect of the death penalty and why it is to be imposed upon him or her"); Ga.Code § 17–10–60 ("unable to know why he or she is being punished and understand the nature of the punishment"); Md.Code Ann., Corr.Serv. § 3–904 ("lacks awareness ... of the fact of the inmate's impending execution; and ... that the inmate is to be executed for the crime of murder"); N.Y.Correct.Law § 656 ("lacks the mental capacity to understand the nature and effect of the death penalty and why it is to be carried out"); Ohio Rev.Code Ann. § 2949.28 ("does not have the mental capacity to understand the nature of the death penalty and why it was imposed upon the convict"); Wyo.Stat. Ann. § 7–13–901 ("ability to understand the nature of the death penalty and the reasons it was imposed").

Furthermore, in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the United States Supreme Court, in holding that the execution of mentally retarded persons is not "categorically prohibited" by the Eighth Amendment, found that there was a distinction between the execution of the mentally retarded and the execution of the insane and cited the standard set forth in Justice Powell's concurrence. *See Penry,* 492 U.S. at 333, 109 S.Ct. 2934. Thus, even the Supreme Court has cited this standard for compe-

**24.** In reviewing Petitioner's state court competency proceeding, the Tennessee Supreme Court noted that the *Ford* majority had "failed to articulate the legal definition of insanity in the execution context," and that the opinion of Justice Powell "reflects the narrowest grounds for the Court's judgment and is controlling on the state courts and lower federal courts." *Coe v. State,* 2000 WL 246425, at *12, —— S.W.3d ——, —— (Tenn. Mar.6, 2000) (citing *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977)). In *Marks,* the Supreme Court stated that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....' " *Marks,* 430 U.S. at 193, 97 S.Ct. 990 (citing *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *See also Coe v. Bell,* 161 F.3d 320, 354 (6th Cir.1998).

**25.** In the dissent in *Van Tran,* Justice Birch stated that he believed that the proper standard for competency to be executed should include an "assistance prong." *Van Tran,* 6 S.W.3d at 275. Under common law, this "assistance prong" would require that the individual be able to consult with and assist counsel. As Justice Birch notes, Tennessee currently includes this "assistance prong" in its competency to stand trial test. *Id.* (citing in part *Berndt v. State,* 733 S.W.2d 119, 123 (Tenn.Crim.App.1987)). While this "assistance prong" has been adopted by some states for purposes of whether an individual sentenced to death is competent to be executed, there is no due process requirement that this element be included in such a standard. *See* Miss.Code.Ann. § 99–19–57(2)(b) (1994); *Singleton v. State,* 313 S.C. 75, 437 S.E.2d 53, 57–58 (1993); *State v. Harris,* 114 Wash.2d 419, 789 P.2d 60, 66 (1990).

tency to be executed. *See also Cox v. Norris,* 167 F.3d 1211, 1212 (8th Cir.1999) (adopting the Justice Powell standard as the *Ford* criterion); *Lowenfield v. Butler,* 843 F.2d 183, 187 (5th Cir.1988) (same).

■ Petitioner also argues that the standard as set forth in *Van Tran* violates the Eighth and Fourteenth Amendments because the *Van Tran* standard for determining competency to be executed is a "conjunctive standard [that] requires a petitioner to prove both an 'unawareness' of the execution, as well [as] an 'unawareness' of the reason for the execution. With the petitioner bearing the burden of proof under Tennessee law, this means that a petitioner who was 'aware' of the punishment, but not aware of the reason for it would still be subjected to execution."[26] (Docket No. 1 at 43) While Petitioner's assertion may technically be true, it is clear that *as applied* to the facts of this case, both the trial court and the Tennessee Supreme Court would not have found Coe competent if he had only been aware of his impending execution but had not been aware of the reason for it. Indeed, *Ford* would appear to prohibit an execution in such a circumstance. Thus, while both courts stated that the burden was on the petitioner to establish his incompetence to be executed by a preponderance of the evidence, these courts found that the petitioner was both aware of his impending execution and the reasons for it.

This court finds that the standard for competency to be executed as articulated in *Van Tran* does not violate the Eighth and Fourteenth Amendments to the United States Constitution and is in keeping with the requirements of *Ford.*

Petitioner next argues that in the state court competency hearing, the trial court used a lower standard than that permitted under *Van Tran.* (Docket No. 1 at 43)

In finding Petitioner competent to be executed, the trial court stated,

> Throughout all the testimony given, one fact has been constant; that Petitioner realizes he is facing execution, and that he knows it is because he has been convicted of murdering a little girl. Although he maintains his innocence, *it has been made quite clear to this Court that Petitioner understands that he was found guilty of the murder and was sentenced to die.* Furthermore, even in light of the myriad of mental health diagnoses given Petitioner, the fact that Petitioner knows he is facing execution for the murder of a young girl was repeated by each and every mental health expert. In light of this fact, this Court has no choice but to find that Petitioner is competent to be executed, in accordance with the standard set forth in *Van Tran.*

(Trial Ct.Op. at 27–28 (emphasis added)) Petitioner contends that the trial court did not apply *Van Tran* in finding him competent to be executed because the trial court "determined Robert Coe's competency based upon mere *knowledge* that an execution was to occur because of the death of a young girl." (Docket No. 1 at 44) Petitioner's argument is not well taken. Reading the last paragraph in full, it is clear to this court that Judge Colton referred to the *Van Tran* standard properly.[27] He explicitly stated that "Petitioner understands that he was found guilty of the murder [of a young girl] and was sentenced to die." (Trial Ct.Op. at 27) There can be no doubt that Judge Colton utilized the standard set forth in *Van Tran.*

67. *The state courts relied on an improper burden of proof in requiring Petitioner to establish his incompetency to be executed by a preponderance of the evidence.*

No. 12, Addendum 2, Document 2A, at 45 n. 12.

---

**26.** Although this issue was not addressed by the Tennessee Supreme Court in *Coe v. State,* 2000 WL 246425, —— S.W.3d —— (Tenn. Mar.6, 2000), Petitioner did appear to raise this issue in his brief to that court. *See* Docket

**27.** At the beginning of his opinion, Judge Colton lays out the *Van Tran* standard for competency to be executed, *see* Trial Ct.Op. at 3.

■ Petitioner argues that where he must make a threshold showing of incompetence before a hearing on the issue of competency to be executed will be held, he should not also have the burden of proof at the hearing by a preponderance of the evidence. Once the issue of incompetence is at issue, the burden should be on the state to prove competence to be executed because the state's interest in carrying out the petitioner's execution is trumped by the Eighth Amendment's prohibition against the execution of the insane.

To support his argument, Petitioner relies upon Justice Birch's dissent in *Van Tran*, where he states that he would require "the State to prove, beyond a reasonable doubt, that an individual is competent for execution." *Van Tran*, 6 S.W.3d at 277. However, as the majority in *Van Tran* pointed out, many states place the burden of proof on the individual sentenced to death and require him or her to prove incompetency by a preponderance of the evidence. *See Van Tran*, 6 S.W.3d at 271 (compiling statutes and caselaw). *See also* Colo.Rev.Stat.Ann. § 16–8–111(2); Ky.Rev.Stat.Ann. § 431.2135(3); Md.Code Ann.Corr.Serv. § 3–904(e)(2)(iii); Ohio Rev.Code Ann. § 2949.29; Tex.Crim. P.Code Ann. § 46.04(k); *Weeks v. Jones*, 52 F.3d 1559, 1569 (11th Cir.1995) (reviewing Alabama state competency to be executed proceeding); *Billiot v. State*, 655 So.2d 1, 15 (Miss.1995); *Singleton v. State*, 313 S.C. 75, 437 S.E.2d 53, 60 (1993); *State v. Perry*, 502 So.2d 543, 564 (La.1986).

While the issue of competency to be executed is very different from other matters of competency, Supreme Court precedent in other burden of proof cases is instructive.[28] In *Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), the Supreme Court held that California law that presumed the defendant was competent to stand trial and that placed the burden of proving incompetence on the defendant asserting incompetence did not violate due process.[29] More recently, in *Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), the Supreme Court held that Oklahoma law that presumed that a defendant was competent to stand trial unless the defendant proved his incompetence by clear and convincing evidence was a violation of due process, but it was the clear and convincing standard that troubled the court, not placing the burden of proof on the defendant. *See Cooper*, 517 U.S. at 366, 116 S.Ct. 1373. Here, the state has placed the burden on the individual sentenced to death to prove incompetence by a preponderance of the evidence standard. While there are different interests at stake in the competency to be executed context, in light of these precedents, the court finds that the burden of proof standard in *Van Tran* does not violate due process.

Petitioner asserts that the "Eighth Amendment properly demands that the burden be placed upon the state, especially since the defendant's life is at stake, and the state has no legitimate policy reason for executing the insane."[30] (Docket No. 1 at 49) The court recognizes that the due process concerns are significant in such a

28. In his petition, Petitioner cites to *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) for the proposition that "burdens of proof are designed to allocate the risk of error in light of the competing interests at stake." (Docket No. 1 at 49)

29. In *Medina*, the Supreme Court stated that "[o]nce a State provides a defendant access to procedures for making a competency evaluation," there is "no basis for holding that due process further requires the State to assume the burden of vindicating the defendant's constitutional right by persuading the trier of fact that the defendant is competent to stand trial." *Medina*, 505 U.S. at 449, 112 S.Ct. 2572.

30. Petitioner has also asserted that the burden of proof being on the state is also necessary under the facts of this case. Petitioner states that "[w]ith there having been proof that Robert Coe's mental state fluctuates, it is proper for the state to prove that Robert [Coe] is lucid and competent, rather than having Robert [Coe] prove that he is incompetent." (Docket No. 1 at 49) The court does not agree that a fluctuating mental status should have an impact on who has the burden of proof.

case for, as stated in *Ford*, "execution is the most irremediable and unfathomable of penalties [—] death is different." *Ford*, 477 U.S. at 411, 106 S.Ct. 2595. Nevertheless, the competency to be executed proceeding occurs after the individual has been found guilty of a crime and has been sentenced to death for it. Thus, as the majority of the Supreme Court recognized in *Ford*, the individual sentenced to death "does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced...." *Id.* In a similar vein, Justice Powell stated that "[t]he State may therefore properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process." *Id.* at 426, 106 S.Ct. 2595. Other than these guidelines, *Ford* does not address who must carry the proper burden of proof in a competency to be executed proceeding.

The court finds that Petitioner's argument fails and that the assignment of the burden of proof and the requirement that Petitioner establish his own incompetency by a preponderance of the evidence does not violate the Eighth and Fourteenth Amendments.

68. *Petitioner was denied due process when the trial court failed to exclude expert witnesses from the courtroom during the competency hearing pursuant to Tenn. R.Evid. 615.*[31]

Prior to calling the first witness, Petitioner's counsel asked for the exclusion of all witnesses. (Tr. at 57) Although the court granted the request, the state asked that its expert witnesses, Dr. Martell and Dr. Mathews, be allowed to remain in the courtroom.[32] Petitioner objected in light of the fact that his expert witnesses would not able to remain in the courtroom during the testimony of the state's expert witnesses. (Tr. at 60) The trial court ruled that the expert witnesses of both the state and the defense would be permitted to stay in the courtroom throughout the competency hearing "in an effort to get to the truth of this matter, and ... for the Court to give a proper finding in the case." (Tr. at 61)

Although *Van Tran* does not expressly address the issue of whether experts should be allowed to remain in the courtroom for the entirety of the competency hearing, *Van Tran* does caution that "[a]ny procedure that unreasonably precludes the prisoner from attending and 'presenting material relevant to [the question of] his sanity or bars consideration of that material by the factfinder is necessarily inadequate.'" *Van Tran*, 6 S.W.3d at 271 (citing *Ford*, 477 U.S. at 414, 106 S.Ct. 2595). In seeking to ensure consideration of all material relevant to the issue of competency, *Van Tran* held that "the rules of evidence should not be applied to limit the admissibility of reliable evidence that is relevant to the issue of the prisoner's competency." *Van Tran*, 6 S.W.3d at 271.

---

**31.** Rule 615 of the Tennessee Rules of Evidence states:

At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated

by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

**32.** The Advisory Commission Comments to Rule 615 allude to the common practice of expert witnesses qualifying as persons "essential to the presentation of the party's cause" who, therefore, may remain in the courtroom.

Thus, Judge Colton did not act outside the bounds of *Van Tran* by allowing the expert witnesses to remain in the courtroom during the competency hearing.

In addressing this claim, the Tennessee Supreme Court, found that, because the United States Supreme Court stated in *Ford* that "the adversary presentation of relevant information should be as unrestricted as possible," *Ford*, 477 U.S. at 417, 106 S.Ct. 2595, the sequestration rule did not apply to the competency hearing. *Coe v. State*, 2000 WL 246425, at *26, —— S.W.3d at ——. The Tennessee Supreme Court also held that the ruling did not violate Petitioner's due process rights because the rule was applied to both parties equally. *Id.* at *27, —— S.W.2d at ——.

The court finds Petitioner's arguments somewhat specious. While Petitioner may argue that he was harmed by the trial court's ruling,[33] the trial court explicitly held that the expert witnesses for both the state and for the petitioner would be allowed to remain in the courtroom. There was no attempt to prejudice the petitioner. While Petitioner complains that the state refused to put on its proof first so that Petitioner would not be disadvantaged by the fact that his expert witnesses could not remain for the entire competency hearing, Petitioner makes the bald assertion that "the state did this solely to skew the truth-finding process." (Docket No. 1 at 50) Petitioner provides no support for this statement and there is no constitutional requirement that the party without the burden of proof must put on its proof first in order to accommodate the party with the burden.

Petitioner has not demonstrated that the trial court's decision to allow all expert witnesses to remain in the courtroom was a violation of due process.

*69a–c. Petitioner's counsel were not permitted to be present during his evaluations by State experts and the Court did* *not require videotaping of the State's evaluations, thus depriving the petitioner of cross-examination material.*

■■■ As ruled by the Tennessee Supreme Court, the petitioner had no right to have his counsel present or have the examinations videotaped. See *Coe v. State*, 2000 WL 246425, at *16, —— S.W.3d at ——. In the trial court's Order so ruling, the parties were ordered to file their expert witness reports on January 13, 2000 and, on the same day, provide to the opposing party each witness's "entire evaluation file, including all raw data, notes and test materials" (Docket No. 12, Vol. I at 93), which material was extensively used during the testimony of petitioner's experts.

In *Van Tran*, the Tennessee Supreme Court stated that "the prisoner must be afforded an opportunity to be heard and to present evidence relevant to the issue of competency at an adversarial proceeding at which the prisoner is entitled to cross-examine the State's witnesses." *Van Tran*, 6 S.W.3d at 271. See also *Ford*, 477 U.S. at 415, 106 S.Ct. 2595 ("Cross-examination of the psychiatrists, or perhaps a less formal equivalent, would contribute markedly to the process of seeking truth in sanity disputes by bringing to light the bases for each expert's beliefs, the precise factors underlying those beliefs, any history of error or caprice of the examiner, any personal bias with respect to the issue of capital punishment, the expert's degree of certainly about his or her own conclusions, and the precise meaning of ambiguous words used in the report.") It is clear from this court's review of the trial court proceeding that Petitioner had every opportunity to cross-examine the State's expert witnesses.

Thus, the fact that counsel was not permitted to attend the examinations and that

---

**33.** Apparently, Petitioner's expert witnesses were unable to attend the entire competency hearing due to the commitments of private practice. (Docket No. 1 at 51) However, Dr.

Merikangas was still in attendance on the third day of the hearing and testified about the gagging procedure. (Tr. 452, 533)

the examinations were not videotaped did not deprive Petitioner of due process.

d–g. *The trial court allowed into evidence oral statements made by the petitioner to prison guards, when the statements had not been provided to petitioner's counsel in advance.*

Petitioner's counsel filed a discovery motion five days before the hearing requesting, among other things, "... the substance of any oral statement which the State intends to offer in evidence at the trial made by the defendant whether before or after arrest *in response to interrogations by any person then known by the defendant to be a law enforcement officer.* T.R.Crim.P. 16(a)(1)(A)." (Docket No. 12, Vol. I at 95–99) (emphasis added) The petitioner's motion tracked the language of Rule 16(a)(1)(A) of the Tennessee Rules of Criminal Procedure. Three days later, and six days prior to the hearing, the trial judge granted the motion, ordering in part that "any information subject to disclosure as set forth in Tenn.R.Crim.P. 16" be provided by both parties. (Docket No. 12, Vol. I at 150)

On at least two occasions during the competency hearing, prison guards testified to statements made to them by petitioner. (Tr. 578–81, 629–34) These statements do not come within the rule, in that prison guards are not law enforcement officers, and they were not "interrogating" the petitioner at the time the statements were made. There were no written accounts of these statements, according to the State, and the State had provided petitioner's counsel with the name of both prison guards prior to the hearing, so that they could be interviewed. (Tr. 580, 629)

As noted by the State, this claim was not presented to the Tennessee Supreme Court and is, therefore, procedurally defaulted. Even were it not, it is without merit.

70. *The trial judge was not an "impartial arbiter."*

Petitioner claims that the trial judge's gagging of him during the proceedings indicated a lack of impartiality. The transcript and videotapes supplied to this court reveal, however, that the trial judge dealt with this challenging development with the utmost fairness, patience and dignity. Not only did the petitioner hurl obscene and lewd insults and threats at the witnesses, judge, attorneys and other persons present in the courtroom, but he told the trial judge specifically, "I will beat your goddamn brains out punk" (Tr. 504), and "I'll have some of my kin folks over there to kill your whole goddamned family" (Tr. 566). He also spat on one of the State's attorneys (Tr. 501–2). Not once did the trial judge even admonish the petitioner, let alone show anger toward him. Also, he never asked Coe's counsel to try to get him under control.[34]

The Tennessee Supreme Court reviewed this issue and correctly found that the trial court did all it could to be fair to the petitioner in dealing with this difficult situation. See *Coe v. State*, 2000 WL 246425, at *27–28, —— S.W.3d at —— – ——. The record simply does not reveal that the trial judge's gagging of Coe evidenced his judgment, arrived at prior to hearing all of the evidence, that Coe was acting with volition. Judge Colton's post-hearing findings concerning Coe's behavior were mandated by *Van Tran, see* 6 S.W.3d at 271, had expert witness support in the record (Tr. 780–81), and were justified by his own observations of Coe during the hearing.[35]

The allegations about the trial judge receiving personal threats from others be-

---

**34.** The videotapes reveal that, during the two days of trial prior to the onset of this outrageously disruptive conduct, petitioner and his lawyers talked back and forth on many occasions. However, once this disruptive conduct started, not one of his several counsel attempted to talk with him, calm him down or convince him to change his behavior.

**35.** The videotapes show that Coe stopped his stream of obscene rantings when something was happening in court that he wanted to listen to. *See* Trial Ex. 12.

fore or during the hearing and making statements after the Tennessee Supreme Court upheld his ruling are not matters which are in this record, and the court will not entertain them. The court does observe, however, that to presume that a judge will decide a case in the way favored by the person making the threat is a large presumption that is rebutted by the federal court history of this very case.

One additional point should be made that goes to Judge Colton's impartiality. The State sought to have admitted into evidence a tape recording of Coe's confession to the murder and rape of which he was convicted. Judge Colton heard both sides and announced he wanted to consider this overnight before making a ruling. (Tr. 1022–27) Despite the strong arguments made by the. State as to the tape's relevancy, Judge Colton ruled before the day was out that he would not receive the tape in evidence. (Tr. 1054)

71. *Dr. Martell's testimony was unreliable.*

The Tennessee Supreme Court dealt at length with the petitioner's contentions about Dr. Martell's testimony. *See Coe v. State*, 2000 WL 246425, at *30–31, —— S.W.3d at ——. Specifically, Petitioner contends that the use of the tests Dr. Martell relied upon in determining that Petitioner was malingering violated due process because the tests have never been validated for death row inmates.

However, as noted by the state courts, these tests were also administered by Petitioner's court-appointed expert, Dr. James Walker. *See* Trial Ct.Op. at 23; *Coe v. State*, 2000 WL 246425, at *31, —— S.W.3d at ——.

72. *The trial court improperly relied upon hearsay statements made by the State's trial counsel in reaching its decision on petitioner's competency.*

The Tennessee Supreme Court correctly ruled that these statements did not constitute prosecutorial misconduct and did not render the hearing "fundamentally unfair." *See Coe v. State*, 2000 WL 246425, at *20–21, —— S.W.3d at ——.

73. *The entire Tennessee State Attorney General's office should have been disqualified from this case, rather than only the Attorney General himself.*

The Tennessee Supreme Court correctly ruled on this issue, see *Coe v. State*, 2000 WL 246425, at *20, —— S.W.3d at ——, and this court has separately ruled on petitioner's motion made in this proceeding, *see* Docket No. ——.

## CONCLUSION

For the foregoing reasons, this court denies Coe's present petition for writ of habeas corpus.

An appropriate Order will enter.

## APPENDIX

ROBERT GLEN COE, Petitioner,

vs.

STATE OF TENNESSEE, Respondent.

NO. B–73812.

Death Penalty

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PETITION TO DECLARE ROBERT GLEN COE MENTALLY INCOMPETENT TO BE EXECUTED

This matter comes before this Court on a PETITION TO PROHIBIT EXECUTION UNDER COMMON LAW, *FORD V. WAINWRIGHT*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) AND THE TENNESSEE CONSTITUTION, filed by Petitioner, Robert Glen Coe. Petitioner cited all applicable law, including common law, the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), and Article I §§ 6, 8, 9, 13, 15, 16, 17, 20 & 32 of the Tennessee Constitution as authority for filing his petition.

## BACKGROUND

Petitioner was convicted of first-degree murder, aggravated rape, and aggravated kidnaping in the Criminal Court of Shelby County on February 28, 1981. He was sentenced to death on the murder charge, and to life imprisonment on the remaining charges. The Tennessee Supreme Court affirmed the conviction and sentence, *State v. Coe*, 655 S.W.2d 903 (Tenn.1983), and the United States Supreme Court denied certiorari. *Coe v. Tennessee*, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984).

Petitioner filed three petitions for post-conviction relief, and two petitions for habeas corpus relief. Ultimately, both Petitioner's conviction and sentence were upheld.

On December 15, 1999, the Supreme Court of Tennessee issued an order holding that the Petitioner had exhausted the standard three-tier appeals process, and set an execution date of March 23, 2000 for the Petitioner. The Court also held that the time was ripe for Petitioner to challenge his present mental competency to be executed, and remanded the issue to this Court, where the Petitioner was originally tried and sentenced, in accordance with the procedures to determine present mental competency to be executed adopted by the Supreme Court in *Van Tran v. State*, 6 S.W.3d 257 (1999). See *Coe v. State*, 11 S.W.3d 118 (Tenn. 1999).

The Petitioner filed a Petition to Prohibit Execution Under Common Law, *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) and the Tennessee Constitution on December 29, 1999. In his Petition, Petitioner alleged that in light of his present mental incompetency it would be unconstitutional to carry out his death sentence. The Petition alleged that over the past 25 years, Petitioner has been found to be insane and incompetent, and listed several of the various diagnoses the Petitioner has been given by numerous mental health professionals. The Petition also alleged that Petitioner has been treated with a plethora of anti-psychotic, anti-seizure, anti-anxiety, and antidepressant medications. The Petition further alleged that Petitioner currently suffers from debilitating mental illness, and that the stress of his upcoming execution date will only serve to exacerbate his mental illness and increase his psychotic symptoms. Attached to the Petition was the affidavit of Dr. William Kenner, M.D. In his affidavit, Dr. Kenner opined that Petitioner was not competent to be executed.

Finding that Petitioner had met the required threshold showing that his competency to be executed was genuinely in issue, in accordance with *Van Tran*, this Court issued an order granting in part and denying in part the above referenced petition. In its order, filed January 3, 2000, this Court granted Petitioner's request that this Court hold a hearing to determine the present mental competency of Petitioner to be executed. The evidentiary hearing began on January 24, 2000, and lasted until January 28, 2000.

## BASIS FOR RELIEF

Petitioner asks that this Court find him presently mentally incompetent to be executed and in support of this request asserts the following:

Petitioner does not meet the cognitive test set forth in *Van Tran v. State*, and is therefore incompetent to be executed and in support of this would show that Petitioner has a history of mental illness, incompetence and insanity, and that at present, Petitioner is exhibiting signs of mental incompetence.

## CONCLUSIONS OF LAW

Before *Van Tran*, Tennessee did not have any statutory or common law procedure for litigating the issue of present competency to be executed. *Van Tran*, 6 S.W.3d at 260. The procedures governing the determination of whether a prisoner is presently mentally competent to be executed were adopted and set forth by the Tennessee Supreme Court in *Van Tran v. State*. Under the law of Tennessee, a

prisoner is not competent to be executed if the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it. This standard is called the "cognitive test." *Van Tran*, 6 S.W.3d at 266. Petitioner now asks this Court to find that he is presently mentally incompetent to be executed.

At the outset, this Court notes that at the competency hearing, the prisoner is presumed to be competent to be executed. *Id.,* at 270; citing *Ford v. Wainwright*, 477 U.S. 399, at 426, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); *State v. Harris*, 114 Wash.2d 419, 789 P.2d 60, at 67 (1990). To prevail, the prisoner must overcome the presumption of competency by a preponderance of the evidence. *Van Tran*, 6 S.W.3d at 271. Furthermore, although likely based on expert medical and mental health testimony, the ultimate question as to whether the prisoner is competent to be executed is a question of fact. *Id.,* citing *Ford*, 477 U.S. at 412, 106 S.Ct. 2595. This court will now discuss the evidence presented to it in Petitioner's competency hearing in accordance with the standards delineated in *Van Tran*.

This Court first heard testimony from Dr. James R. Merikangas, M.D., Dr. Merikangas was appointed by this Court to evaluate the Petitioner at Petitioner's request. Dr. Merikangas had an extensive and impressive curriculum vitae, and was accepted by this Court as an expert in the fields of neurology, neuropsychiatry, and psychiatry. This Court found him to be both a competent and credible witness.[1]

On direct examination, Dr. Merikangas testified that he had utilized the past mental health records of Petitioner in his as-

sessment of Petitioner. In addition, Dr. Merikangas performed a physical examination of Petitioner, had magnetic resonance imaging (MRI) tests as well as positron emission tomogram (a PET scan) run on Petitioner,[2] had talked to Petitioner's sisters, and had given Petitioner an oral interview. From these various physical tests, Dr. Merikangas determined that Petitioner has congenital brain damage, maldevelopment, and probably some acquired brain damage.[3] From his oral interview of Petitioner, Dr. Merikangas opined that Petitioner has delusions and hallucinations, as well as disorders of movement. He further opined that Petitioner's peculiarities of thinking were symptomatic of schizophrenia, and testified that his diagnosis of Petitioner was that he was a chronic paranoid schizophrenic,[4] and that this schizophrenia causes Petitioner to be incompetent to be executed.

In support of his diagnosis of chronic paranoid schizophrenia, Dr. Merikangas testified that the fact that Petitioner has elected to stay in his cell in the jail where he is housed, rather than to be part of the prison population was one factor he considered. Dr. Merikangas testified that he also considered Petitioner's prison records dating from 1981 to the time of the hearing which document "wild episodes where he [Petitioner] will wind up on one medication or another." Some other contributing factors in Dr. Merikangas' diagnosis were Petitioner's nicotine addiction, as well as the amount of coffee he drinks, and his periphilia, e.g., tendency to masturbate in public.[5] When questioned as to whether he felt the Petitioner was malingering, Dr. Merikangas indicated that he felt Petition-

---

1. The Court notes that Dr. Merikangas' credibility was somewhat diminished by some statements made during cross examination that blatently contradicted those elicited on direct, as well as a showing by Dr. Merikangas of bias and unwillingness to cooperate with State's attorney on cross.

2. Dr. Merikangas testified that while the MRI scan showed abnormalities in the structure of

Petitioner's brain, Petitioner's PET scan was normal.

3. Transcript of the proceedings, January 24, 2000, Volume I, page 90, lines 9–11.

4. Id., at page 111, lines 10–23.

5. Id., at page 115, lines 1–20.

er was not. Dr. Merikangas further opined that if Petitioner was lucid for a time, or was in a period of remission from his schizophrenia, given the impending stress of an execution, Petitioner would dissociate to such a point that he would be incompetent to be executed under Tennessee law.[6]

When questioned about Petitioner's other expert witness, Dr. William Kenner, and his diagnosis that Petitioner suffers from Dissociative Identity Disorder (DID), Dr. Merikangas testified that the diagnosis of DID was consistent with his diagnosis of schizophrenia.[7]

Dr. Merikangas was next questioned as to his opinion of the diagnoses of the State's Court appointed experts. Dr. Merikangas expressed contempt for both of the State's experts, and described their methods of evaluating Petitioner[8] along with their findings as invalid, not credible, and as "junk science."[9] Dr. Merikangas also commented several times on the fact that Dr. Martell spent only seven hours with Petitioner, an amount of time he felt insufficient to reach the diagnosis given by State's experts.[10]

When questioned by counsel as to whether Petitioner was competent to be executed in accordance with the *Van Tran*

standard, Dr. Merikangas' answer was somewhat unresponsive. Dr. Merikangas appeared to be playing semantic games with the word understanding. Dr. Merikangas testified that Petitioner is aware that he is going to be executed, that Petitioner claims he is innocent of the crime for which he has been convicted and sentenced to die, and that Petitioner claims he is being killed to conceal the identity of the real killer. However, due to Petitioner's unconventional beliefs about reincarnation,[11] Dr. Merikangas concluded that Petitioner does not fully understand the consequences of being executed.[12] Dr. Merikangas went on to explain that because Petitioner maintains he is innocent of the crime, and that he is being killed to conceal the identity of the "real killer", he obviously does not understand the reason he is being executed.[13] Dr. Merikangas further opined that as Petitioner's execution draws near, Petitioner will become even less competent than he is at present.

On cross examination, Dr. Merikangas testified he had seen Petitioner one time for a total of an hour and a half,[14] that the actual notes of his interview composed only one page, and that in fact he generally did not even take notes when interviewing a patient.[15] Regarding his comments about the tests administered to Petitioner

6. Id., page 124, lines 19–25.

7. Id., at page 123, lines 14–18.

8. This Court notes, however, that in his report, Dr. Merikangas states he relied upon the neuropsychological testing performed by Dr. James S. Walker, Ph.D to reach his diagnosis, and ironically, the testing done by Dr. Walker is almost identical to the testing done by Dr. Martell.

9. Id., page 138, lines 14–17.

10. This Court notes that it found Dr. Merikangas' contempt regarding the amount of time spent with Petitioner by State's experts somewhat surprising, in light of the fact that Dr. Merikangas spent a total of only one and one-half hours with Petitioner, a third of which was comprised of the physical examination of Petitioner.

11. Petitioner apparently ascribes to the theories of writer/philosopher Edgar Cayce, in that Petitioner believes he will be reincarnated after his execution and return to earth.

12. This Court disagrees with Dr. Merikangas' opinion that Petitioner's beliefs in reincarnation were delusional. This Court takes judicial notice that reincarnation, while not a Christian belief, is a theory ascribed to by many people besides Petitioner.

13. Transcript of the proceedings, Volume I, page 162, lines 8–25; page 163, lines 1–8.

14. Transcript of the proceedings, Volume II, page 182, lines 6–8.

15. Id., page 183, lines 14–23.

by State's experts, specifically that they were not recognized as valid tests to determine malingering. Dr. Merikangas conceded that Dr. Richard Rogers, the foremost expert in the United States on malingering, lists the very tests used by the State's experts as one of the methods to use to determine malingering.[16]

When questioned about Petitioner's unusual belief concerning reincarnation as a basis for his determination that Petitioner was incompetent to be executed, Dr. Merikangas testified that this belief was not determinative of whether he was incompetent, but rather the fact that Petitioner is a chronic paranoid schizophrenic[17] was the reason he found him incompetent.[18] Interestingly enough, Dr. Merikangas had previously testified that "you can be schizophrenic and be competent, or you can be schizophrenic and be incompetent."[19]

Upon further questioning by the State, Dr. Merikangas again stated that although Petitioner told him that he did not commit the crime for which he was going to be executed, Petitioner is aware of his impending execution, and that he was sentenced to die for the murder of a young girl. Finally, Dr. Merikangas testified that he agreed with the reports of Dr. Martell, Dr. Matthews, Dr. Auble, Dr. Walker, and Dr. Kenner that Petitioner realizes he was sentenced to die for the murder of a young girl.[20] At this point, the witness became somewhat uncooperative with the State, even refusing to help State's counsel pronounce a medical term when asked for help by State's counsel.[21]

Petitioner's counsel next examined Dr. William Kenner, M.D.. Dr. Kenner also had an extensive and impressive curriculum vitae, and was accepted by this Court as an expert in psychiatry. Dr. Kenner examined Petitioner on four separate occasions. Dr. Kenner testified that he reviewed Petitioner's old medical records, and utilized the reports of Dr. Matthews, Dr. Martell, and Dr. Merikangas in his evaluation of Petitioner.

Dr. Kenner testified that on his first visit with Petitioner, which took place December 22, 1999, he discovered that Petitioner sometimes "loses time," and further testified that he found him to be incompetent after this initial visit and diagnosed him as a schizophrenic.[22]

Dr. Kenner visited Petitioner a second time on January 10, 2000. At the conclusion of this visit, Dr. Kenner testified that Petitioner was no longer manifesting psychotic symptoms, and that he thought him competent to be executed.[23]

Dr. Kenner's third visit took place January 11, 2000. Dr. Kenner testified that on this visit, Petitioner did not remember the previous might's visit, and that he believed this loss of memory to be genuine. In addition to memory loss, the Petitioner gave a history of his childhood to Dr. Kenner wholly inconsistent with any history previously given. Dr. Kenner testified that after he questioned Petitioner about the death penalty, he became agitated and asked to be taken back to his cell. From this third interview, Dr. Kenner began to think that Petitioner suffered from Dissociative Identity Disorder, hereafter referred to as DID, and opined that he was not competent to be executed.

Dr. Kenner's fourth visit took place on January 12, 2000. At this time, Petitioner showed Dr. Kenner a letter he had re-

---

16. Id., page 185, lines 5–25.

17. This Court notes here that Dr. Merikangas was the only doctor of six who evaluated Petitioner who ultimately concluded he was a paranoid schizophrenic.

18. Id., page 191, lines 14–20.

19. Id., page 169, lines 2–4.

20. Id., page 201, lines 8–25; page 208, lines 1–6.

21. Id., page 221, lines 12–15.

22. Id., page 298, lines 8–11; page 299, lines 3–13.

23. Id., page 302, lines 1–2.

ceived from another prisoner, in which Petitioner was threatened with bodily harm. Petitioner told Dr. Kenner that he had received the letter the previous evening before Dr. Kenner had visited him.[24] Dr. Kenner testified that this letter was significant in his finding of DID because the letter represented a threat to Petitioner's physical integrity, causing him a great deal of stress, and accordingly, Dr. Kenner felt the stress stirred by the letter produced the period of separate identity exhibited by Petitioner the previous night.[25] In addition to the diagnosis of DID, Dr. Kenner also diagnosed Petitioner as suffering from generalized anxiety disorder, schizoeffective disorder (bipolar type), poly substance abuse, learning disorder, reading disorder, and schizoid personality disorder with antisocial features.

Dr. Kenner went on to testify that during this fourth visit, Petitioner described several instances of having difficulty with his memory. This Court notes here that even in what Dr. Kenner describes as a dissociative period, Petitioner was still able to talk knowledgeably about his attorney Henry Martin, a federal public defender in Nashville who is working on some of Petitioner's federal appeals, as well as attorneys Robert Hutton and Jim Walker, both of whom represented Petitioner in the competency hearing.[26] When questioned if he felt Petitioner was malingering. Dr. Kenner testified that he did not feel that Petitioner was malingering. Dr. Kenner further stated that the tests administered to the Petitioner by the State's expert Dr. Martell, the MMPI–II in particular, were not effective tools to test malingering in death row inmates.

When questioned about his diagnosis of DID and what effect it might have on Petitioner's ability to understand that he was going to be executed and the reason for it, Dr. Kenner stated that in a dissociated state, Petitioner would not have the mental capacity to understand his upcoming execution.[27] Dr. Kenner further testified that with a reasonable degree of medical certainty, he felt that Petitioner would not be competent to be executed because the upcoming stress of an execution date would cause him to dissociate.[28]

On cross examination, Dr. Kenner admitted that he felt the Petitioner was a manipulative person, so much so that he had advised Dr. Merikangas of the same.[29] Dr. Kenner also testified that he was aware that Petitioner had lied to numerous treating mental health physicians in the past, and had in fact bragged to people that he [Petitioner] could manipulate mental health experts to believe anything he wanted them to believe. However, Dr. Kenner maintained that he felt Petitioner's confusion and loss of memory during his interviews with him was genuine.[30] Dr. Kenner went on to say that Petitioner has an underlying psychotic process of some kind, which could be paranoid schizophrenia, and that when not under stress, he is competent to be executed.[31] Dr. Kenner admitted that on his fourth visit with Petitioner, he found him competent to be executed in accordance with the *Van Tran* standard, although he felt he could dissociate in the future, which would render him incompetent.[32]

This Court, while certainly not an expert in the field of mental health disorders, has some question about the diagno-

---

**24.** Transcript of the proceedings, Volume III, page 323, lines 17–18.

**25.** Id., page 327, lines 3–6.

**26.** Transcript of the proceedings, Volume II, page 310, lines 8–17.

**27.** Transcript of the proceedings, Volume III, page 341, lines 16–19.

**28.** Id., page 344, lines 19–25; page 345, lines 1–8.

**29.** Id., page 350, lines 18–25.

**30.** Id., page 357, lines 3–22.

**31.** Id., page 261, lines 3–19.

**32.** Id., page 362, lines 1–4.

sis of DID. On cross examination, Dr. Kenner stated that a person with DID has two identities, a primary and a secondary. The secondary identity is manifested when the first identity is under stress. Of particular interest to this Court was Dr. Kenner's explicit statement that "the secondary identity has no awareness of the primary identity, any of the primary identity's past history, why he is on death row, what is about to happen to him, anything like that."[33] As cited above, during what Dr. Kenner described as a dissociative state for Petitioner, e.g., the overtaking of Petitioner's primary identity by his secondary identity, Petitioner's "secondary identity" was well aware of the names of his "primary identity's" attorneys, both those who represented him in federal court as well as the trial court competency proceedings, and was also aware that he had pending claims in federal court. This Court finds that this is in direct contravention of Dr. Kenner's explanation of DID and how it manifests itself.

At the close of Dr. Kenner's testimony, counsel for the Petitioner rested, and the proceedings were adjourned until the next day, when the State would begin presentation of its case.[34] When the hearing resumed the next morning, the State first called lay witness Sergeant James W. Horton. It was at this point that the Petitioner's behavior became of significant interest to this Court. This Court will first discuss

Petitioner's behavior before discussing the testimony of the State's lay witnesses.

From the first day of the hearing, Petitioner attempted to disrupt the competency proceedings. Petitioner made insulting and inappropriate statements to the Court. In addition, Petitioner whistled and banged on chairs with his hands, making such noise that the Court was forced to find a chair comprised only of soft, cushy material for the Petitioner. The Petitioner complained about the chair, and when the Court instructed the bailiffs to leave Petitioner in the "soft chair," Petitioner stated to his attorneys, "Make a note of that. When we appeal it. Take his ass off that bench."[35] Petitioner again addressed the Court regarding the change of his chair, stating to the Court, ". . . I know why he done it. Because I was using it like this. [simultaneously beating on his lawyer's chair, located beside him] How do you like that? Can you hear that, Judge? Just happen to have one here I can beat on. How's that, Judge?"[36]

This disruptive behavior reached a climax on the third day of the hearing. Upon entering the courtroom, the Petitioner turned to the court gallery and stated, "I ain't doing this to disrespect you all,[37] but I ain't staying here no more. You can either send me back or we're just going to have some problems now."[38]

The Court allowed the first witness of the day, Sergeant James W. Horton, a

---

**33.** Id., page 360, lines 12–20.

**34.** This Court notes that before resting its case, Counsel for Petitioner also introduced testimony in the form of two lay witnesses, both spiritual counselors at River Bend Maximum Security Institution. Both lay witnesses testified that Petitioner has exhibited some form of memory loss in their presence. For example, both witnesses testified that Petitioner had told them he had made a cup of coffee, only to find it cold as ice when he started to drink it. This Court will not discuss their testimony in great detail, as neither was able to render an opinion as to whether Petitioner was competent in accordance with the standard set forth in *Van Tran*.

**35.** Transcript of the proceedings, Volume I, page 55, line 20–21.

**36.** Id., page 56, lines 5–9.

**37.** Proof was later entered into the record in the form of testimony from Charlotte Stout that this statement was directed at the victim's mother, Charlotte Stout. Transcript of the proceedings, Volume V, page 688, lines 14–22.

**38.** Transcript of the proceedings, Volume IV, page 479, lines 9–12.

guard at River Bend where Petitioner is housed, to take the stand. At this point, the Petitioner began to scream so loudly that both attorneys for the Petitioner and the State were forced to stand directly in front of the witness at the witness chair in order to question him and to hear his responses. Petitioner's screaming consisted of obscenities and threats directed at the Court, the court clerk, the capital case law clerk, the State's attorneys, the witness, and the court reporter.

The Court makes special note here that although obscene, Petitioner's shouting was conversational in that Petitioner responded, albeit in an inappropriate and offensive manner, to statements by the Court in both a logical and coherent manner. His comments were completely in content with what was being said in the courtroom. Petitioner was aware of his situation, and of what was going on around him enough so that he was even able to interject his own responses to questions of the witness asked by counsel before the witness was able to answer.

For example, when Sergeant Horton was questioned as to what his job was at River Bend, the Petitioner interjected, shouting, "He wasn't goddamn thing. He was a whore." [39] The Petitioner then invited the Court to get mad at him for his antics.

As the Sergeant testified, Petitioner threatened him, even calling him by name at times. For example, the Petitioner stated, "Just remember you got to be back at River Bend whore. You won't have all these goddamn people protecting your ass up there, bitch." [40] Petitioner also stated, "Oh, you're a lying dick sucking bitch, Horton. And you remember, bitch, I'm going to be back over there [at River Bend]. Don't be trying to hide, you punk ..." [41] Several other threatening statements were made to Sergeant Horton over the course of his testimony by the Petitioner in addition to the two statements cited above.

When the Court directed that the proceedings would continue in light of Petitioner's antics, Petitioner elevated his disruptive behavior, shouting to the courtroom, "Can you all hear me, bitch?" [42], then telling the Court, "You'll regret bringing me down here you goddamn Judge Judy want to be." [43]

At this point in the proceedings, Petitioner, calling Attorney General Glen Pruden by name and addressing Mr. Pruden's status as an attorney for the State, began spitting on Mr. Pruden, and Mr. Eric Dabbs, another attorney for the State. Due to the spitting, the State suggested, and the Court so ordered, that the Petitioner be gagged, in accordance with the United States Supreme Court case of *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). [44] Because the Court felt that the Petitioner should be present in the courtroom for his competency proceedings, the Court felt that gag restraints would be an appropriate measure, given the Petitioner's behavior.

While making its ruling regarding the gag restraint, Petitioner interrupted the Court shouting, "Gag coming up." [45] The Petitioner further informed the Court that he would continue to "holler" until the

---

39. Id., page 485, lines 2–10.

40. Id., page 490, lines 17–20.

41. Id., page 581, lines 2–5. The Court notes that these are but two of a plethora of statements and threats made to Sergeant Horton by the Petitioner.

42. Id., page 492, lines 21–22.

43. Id., page 493; lines 9–10.

44. The Court notes that Petitioner's attorneys objected to gag restraints because they felt it to be both a health risk, and a determination by this Court that Petitioner's behavior was willful. The Court further notes that a paramedic applied the restraints, and was present in the courtroom at the request of the Court, no more than five feet from the Petitioner, in the event that Petitioner required medical attention.

45. Id., page 511, line 10.

Court ordered the gag,[46] and that the gag would not stop him from making noise; that he would just hum real loud once gagged.[47]

Indeed, the Petitioner lived up to his promise. After being gagged with gauze, the Petitioner found and made evident to the Court that he was still able and would continue to shout and disrupt the hearing, stating, "Fuck you, bitch. You hear that whore. I can still holler, bitch,"[48] and, "Think you can shut me up. Fuck you, bitch."[49]

Shortly after they were applied, Petitioner was able to remove his gauze restraints, and new gag restraints in the form of medical tape were applied across the Petitioner's mouth. These too proved to be of little value in keeping the Petitioner quiet. It became obvious to the Court that the Petitioner would not calm his antics, as he had disrupted the proceedings for over three hours. At this point, the Court determined that Petitioner had waived his right to be present in the courtroom. A discussion was held side bar where the Court indicated to all attorney's that because Petitioner's behavior was so disruptive of the proceedings, a separate room with a closed circuit television would be provided to Petitioner after the lunch break in which he could view the remainder of the competency proceedings, and it was so ordered.[50] Petitioner addressed the Court and its ruling, stating, "... I won. You're going to send me out of here,

bitch. You're a weak mother fucker ..."[51]

Before he was sent out of the courtroom, however, Petitioner made several statements in addition to those cited above that were of particular interest to this Court, in that they suggest Petitioner was cognizant of his situation and his surroundings, what the purpose of the competency hearing was, who the State's attorneys were, and their role in the hearing. Petitioner also illustrated that he was familiar with the court process, the appeals process, and even some rules of evidence.

For example, addressing the Court, Petitioner stated, "You better send me back to River Bend ... I didn't ask to come here in the first place ... You want to know if I'm crazy, you should have asked me ...,"[52] and, "You know goddamn well you're going to tell them ain't nothing wrong with me so what the ... you waiting for?"[53] Petitioner also stated, "Old Judge Nixon is going to fuck your ass up punk. Everything you say and do is going to get overturned. This is a waste of ... time and money here ... You just wanted to be on TV."[54] Again referring to Judge Nixon, Petitioner stated, "... You just going to let that federal judge overrule your ... ass. That's all you're doing,"[55] and, "Hey, don't worry about it. Judge Nixon is going to overturn anything that punk says. And he knows it, too."[56] Fi-

---

46. Id., page 513, lines 19–20.

47. Id., page 518, lines 7–9.

48. Id., page 531, lines 16–17.

49. Id., page 545, lines 24–25.

50. The Court notes here that Larry Nance, one of Petitioner's attorneys, was required by this Court to be present with Petitioner at all times in the room where Petitioner viewed the proceedings through closed circuit television. In addition, this Court allowed Petitioner's attorneys Jim Walker and Robert Hutton to go back to the "closed circuit viewing room" to confer with Mr. Nance and Petitioner after each witness.

51. Id., page 565, lines 23–25.

52. Id., page 586, lines 13–17.

53. Id., page 587, lines 1–3.

54. Id., page 568, lines 5–9. The Court notes that Petitioner was referring to Judge John T. Nixon, Federal Judge, who has had much contact with Petitioner's federal claims, and who issued an opinion ten days prior to the beginning of Petitioner's competency hearing, holding that Petitioner could pursue a "Ford" claim, challenging both his competency to be executed and the adequacy of state procedures used to determine his competency to be executed, in a separate habeas corpus petition in the United States District Court for the Middle District of Tennessee.

55. Id., page 577, lines 14–16.

56. Id., page 588, lines 19–21.

nally, again in reference to the appeals· process, Petitioner stated, "Fuck you, Judge Colton ... you know the federal court's going to over. turn your ass ... no matter what you rule ..."[57] Petitioner then made reference to the trial court judge who initially tried his case, Judge William Williams, calling him by name.[58] Also of interest to this Court, when Sergeant Horton was questioned about when and how medication is distributed to inmates at River Bend, Petitioner shouted, "... He can't testify about what somebody else saw, Do your goddamn job, you fucking shit son of a bitch lawyer ..."[59]

Again, although obscene, and certainly inappropriate in a courtroom setting, what became obvious to this Court was that Petitioner's behavior was a deliberate attempt to disrupt the competency proceedings. Petitioner did not want to be in the courtroom, and made concerted efforts to have himself removed.

Petitioner's attorneys assert that this behavior was not willful, but rather an involuntary result of his mental defects. This Court can not agree with this assertion. This Court realizes that Petitioner certainly may have some personality disorder, as attested to by several of the mental health experts. However, there was also testimony from the doctors that a person could have a personality disorder, a mental disease, or even brain damage, and still be competent, or aware of his actions.

This Court finds that Petitioner's behavior was willful, and that he behaved in such a fashion for no other purpose than to disrupt the competency proceedings. Furthermore, although not dispositive of the issue of Petitioner's present mental competency to be executed, Petitioner's behavior served as a strong indicator to this Court that Petitioner was cognizant of the reason

he was in court and what the purpose of the proceedings was, and that he was aware of the various people in the courtroom and the role each served in the proceedings. Again, while Petitioner's antics were unpleasant, vile and disruptive, they did not appear to be involuntary reactions. The Petitioner did not engage in incoherent rambling. To the contrary, the Petitioner made pointed and responsive remarks. The fact that this behavior was not beyond the Petitioner's control was further made evident to this Court when subsequent to his removal from the courtroom, the behavior immediately ceased. This includes his removal to the holding cell directly adjacent to the courtroom where his gag restraints were applied, as well as the separate viewing room. Indeed, once the Petitioner was removed to his separate viewing room, no further outbursts from Petitioner were reported

Once the proceedings resumed, the State called three more guards from River Bend to testify. As with the Petitioner's lay witnesses, the testimony of the State's lay witnesses will not be discussed in great detail. The gist of the lay witness testimony was that Petitioner was not a behavior problem in jail. In fact one guard stated he wished he had a hundred prisoners just like him. Each of the guard witnesses testified that they had never seen Petitioner in a dissociated state. To the contrary, the witnesses testified that Petitioner was friendly most of the time, and was responsive when greeted, sometimes calling the guards by name. However, as with Petitioner's lay witnesses, none of the State's lay witnesses could render an opinion as to whether Petitioner was competent in accordance with the *Van Tran* standard.

The next expert to be called was State's expert Dr. Daryl B. Matthews, M.D., Ph. D.. [60] As with the previous experts, Dr.

---

**57.** Id., page 598, lines 14–19.

**58.** Id., page 569, lines 9–14.

**59.** Id., page 572 lined 13–16.

**60.** Before calling Dr. Matthews, the State called Mrs. Charlotte Stout to the stand and Mrs. Stout read a letter purportedly written

to her by the Petitioner. This Court found that there was circumstantial evidence that the letter was written by Petitioner. However, this Court felt that the letter had little relevance to Petitioner's competency, and the letter was not considered in this Court's determination of Petitioner's competency to be executed.

Matthews had an extensive and impressive curriculum vitae, and was accepted by this Court as an expert in forensic psychiatry. This court found him to be a competent and credible witness.

On direct examination, Dr. Matthews testified that the components of his psychiatric evaluation of Petitioner consisted of a detailed psychiatric history, which included inquiries about many different life areas, and a mental status examination, which included an assessment of Petitioner's current mental functioning. In addition, Dr. Matthews testified that he had questioned Petitioner extensively about his knowledge of his impending execution and the reason he was to be executed. Dr. Matthews stated that he had spent a total of five hours with Petitioner.[61]

Dr. Matthews testified during his examination, he learned a great deal about Petitioner, and went into extensive detail with this Court about his findings. Dr. Matthews testified that Petitioner gave him a personal history consistent with that given to other mental health professionals. Dr. Matthews testified that he noted the constant tremor Petitioner exhibited, and he pointed this out to Petitioner. Petitioner told Dr. Matthews that he has always had the tremors, that he does not like sitting still, and that he feels better when moving.[62]

Dr. Matthews testified that Petitioner told him he remains in his cell most of the time and chooses not to take exercise because he fears the other inmates.[63] Dr. Matthews testified that he talked with Petitioner a bit about this fear, and that Petitioner explained that his fear of inmates was due in large part to Petitioner's awareness of the repugnance in which his offense is held by other inmates. Dr. Matthews also testified that Petitioner told him he is unhappy with his lawyers' attempts to prove him crazy rather than trying to prove him innocent.[64]

Dr. Matthews testified that when questioned about his understanding of death, Petitioner understood what the death of the body is. Petitioner told Dr. Matthews that he believes that there is a soul and that it goes somewhere. Dr. Matthews further testified that Petitioner expressed his belief in reincarnation to him in extensive detail, and stated that his views on reincarnation are those of Edgar Cayce.[65] Petitioner stated to Dr. Matthews that he did not "get" these views from Cayce, but that Cayce essentially echoed his views.[66]

In further reference to his understanding of death, Dr. Matthews testified that Petitioner related that he had expressed an interest in organ donation, specifically, his eyeballs, but that the warden would not allow him to do so. Dr. Matthews testified that Petitioner stated to him that he thought that once you die, you die, and the body was no longer of any use, so he was curious as to why the warden would not allow his eyes to be used.[67]

Dr. Matthews testified that when he questioned Petitioner about his execution, Petitioner told him that he does not believe he will be executed. Dr. Matthews also testified that Petitioner told him that he was given a paper in which he was asked to choose his method of execution, and that he had chosen "the needle." Petitioner further informed Dr. Matthews that his lawyers were angry at him when he chose a method, and that they [his

61. Transcript of the proceedings, Volume V, page 710, lines 11–24.

62. Id., page 717, lines 6–16.

63. Id., page 727, lines 3–6.

64. Id., page 730, lines 15–20.

65. Id., page 732, lines 5–25.

66. Id., page 733, lines 1–9. Dr. Matthews explained that Edgar Cayce is a famous American prophet and fake healer who died in the nineteen forties, and who has written scores of books and sold millions of copies of said books.

67. Id., page 734, lines 17–22.

lawyers] told him not to sign any papers. Dr. Matthews testified that Petitioner was irritated by his lawyers' instructions, and stated that he was a grown man and could sign anything he wanted to.[68]

Dr. Matthews testified that when he questioned Petitioner about his competency hearing. Petitioner stated that he understood that a hearing was going to be held on the issue of his competency, and that he did not want to go.[69]

Dr. Matthews testified that Petitioner is aware that he is alleged to have killed a girl, but that Petitioner minimized the seriousness of the offense and stated that people get murdered all the time. Dr. Matthews testified that when he asked Petitioner if he was convicted or found guilty of that murder, he said he was not, because in order to be found guilty, one must in fact be guilty, and he is innocent. Dr. Matthews testified that he questioned him further on this issue, and asked him if the judge said he was guilty. Petitioner told Dr. Matthews that the judge said he was guilty and that he was going to die, and that the reason was the murder.[70]

Dr. Matthews testified that Petitioner further expressed his innocence of the crime, stating that the crime was actually committed by a man named Donald Gant, and that both he [Petitioner] and the government have proof that he did not commit the crime.[71] Dr. Matthews testified that Petitioner told him that the witnesses against him changed their stories on the witness stand, that Donald Gant had claw marks on his face, and that Donald Gant had been arrested before for "messing around with kids." Petitioner further stated to Dr. Matthews that his confession was coerced.[72]

Dr. Matthews testified that when he questioned Petitioner about what the effect of a finding of incompetence would be, Petitioner told him that they give you drugs to make you well, and then they kill you.[73]

When Dr. Matthews finished testifying about the information he had received through his interview with Petitioner, he was asked by the State if he had reached any conclusions regarding a diagnosis of Petitioner. Dr. Matthews testified that he diagnosed Petitioner as suffering from pariphilia, not otherwise specified, e.g. exhibitionism, poly-substance dependance in a controlled environment, adjustment disorder with mixed anxiety and depressed mood, nicotine dependance, malingering, possible neuroleptic induced Parkinsonism, noncompliance with medical treatment, antisocial personality disorder, borderline personality disorder, and schizotypal personality disorder.[74]

Dr. Matthews then testified as to how he had reached these various diagnoses. Dr. Matthews stated that the pariphilia was well documented throughout his medical records, and indeed, the Petitioner had also expressed his tendency to masturbate constantly.

Dr. Matthews stated that the adjustment disorder with mixed anxiety could be attributed to Petitioner's living conditions and the fact that he is facing execution.[75]

In regard to the diagnosis that the Petitioner was malingering, Dr. Matthews testified that the diagnosis was based on the assessment of malingering made by countless other professionals in the past, on Petitioner's own admission to Dr. Matthews that he had lied to mental health experts in the past, on Petitioner's perfor-

**68.** Id., page 735, lines 9–21.

**69.** Id., page 735, lines 22–25.

**70.** Id., page 736, lines 2–19.

**71.** Id., page 736, lines 20–24.

**72.** Id., page 737, lines 2–19.

**73.** Id., page 738, lines 1–4.

**74.** Id., page 740, lines 6–25; page 741, lines 1–25; page 742, lines 1–23.

**75.** Id., page 747, lines 8–25.

mance on the various psychological tests administered by Dr. Martell and Dr. Walker, and on the fact that there has been a highly variable and inconsistent pattern of symptom presentation by Petitioner through the years. Dr. Matthews also stated that malingering is associated with anti-social personality disorder, another diagnosis given Petitioner by Dr. Matthews.[76]

In regard to his diagnosis of anti-social personality disorder, Dr. Matthews testified that some of the factors that contributed to this diagnosis were Petitioner's failure to conform to social norms with respect to lawful behaviors, his deceitfulness as indicated by repeated lying, his impulsivity or failure to plan ahead, his irritability and aggressiveness as documented in his hospital records, his consistent irresponsibility before he was incarcerated, his lack of remorse as indicated by being indifferent to having hurt or mistreated another,[77] and the fact that Petitioner has a long history of being diagnosed with anti-social personality disorder.[78]

Dr. Matthews testified that he also diagnosed Petitioner with borderline personality disorder. He also testified that the symptoms of borderline personality disorder and anti-social personality disorder often overlap. Dr. Matthews further testified that Petitioner's disruptive behavior discussed by this Court above was fairly classic borderline behavior.[79] Dr. Matthews stated that some of the other factors that contributed to this diagnosis were a marked and persistent unstable self-image, which is often confused with multiple personality disorder, impulsivity, recurrent suicidal behavior, affective instability due to a marked reactivity of mood, irritability or anxiety, inappropriate intense anger or difficulty controlling anger, and transient stress related paranoid ideation or severe dissociative symptoms.[80]

When asked to comment on the Petitioner's outburst of the previous day, Dr. Matthews testified that he felt Petitioner was completely in control of his behavior, evidenced by the fact that Petitioner was able to walk into the courtroom quietly, behave with respect toward Mrs. Stout, then sit down and become phenomenally loud and abusive. Dr. Matthews further testified that he found this behavior remarkable because of the extent to which it was accompanied by a complete cognitive awareness of what was going on, evidenced by the fact that Petitioner was able to identify all the participants of his hearing, including people he had not seen in years. Dr. Matthews testified that this cognitive awareness was further evidenced by Petitioner's understanding of the appeals process.[81] Dr. Matthews commented that despite his intense display of emotion, it was obvious to him that Petitioner retained a command of the material and understood what was going on, and that this behavior was obviously motivated behavior in that Petitioner did not want to be at the hearing so he made it known.[82]

When questioned about Dr. Merikangas' diagnosis of paranoid schizophrenia, Dr. Matthews testified that he thought it unlikely that Petitioner suffered from schizophrenia.[83] Dr. Matthews testified that he reached this conclusion in part due to the lack of documentation of delusional thoughts by defendant, as well as the fact

76. Id., page 750, lines 1–25; page 751, lines 1–25; page 752, lines 1–25; page 753, lines 1–25; page 754, lines 1–12.

77. Id., page 755, lines 1–18.

78. Transcript of the proceedings, Volume VI, page 762, lines 19–20.

79. Id., page 769, lines 4–17.

80. Id., page 772, lines 4–25; page 773, lines 1–23; page 774, lines 1–22.

81. Id., page 780, lines 1–23.

82. Id., page 781, lines 1–4.

83. Id., page 786, lines 20–24.

that Dr. Herbert Meltzer, a foremost expert in the United States in the area of schizophrenia, did not find evidence of schizophrenia in the Petitioner.[84]

When questioned about his opinion of Dr. Kenner's diagnosis of DID for Petitioner, Dr. Matthews stated that he felt it to be the remotest and tiniest possibility he could imagine.[85]

Finally, when questioned as to Petitioner's competency to be executed, Dr. Matthews stated that he believed that Petitioner understands he is going to be executed and that he believed Petitioner understands the reason for it, and that he was therefore competent to be executed in accordance with the standard act forth in *Van Tran.*[86]

On cross examination, Dr. Matthews testified that his practice was a forensic practice, not a general practice, that the last time he had treated a schizophrenic patient was 1990, and that he had never treated anyone with DID.[87] It was further elicited from Dr. Matthews that he was a skeptic about the condition of DID in general.[88] Dr. Matthews also testified that he had not personally verified Petitioner's account of his personal history detailing the abuse he suffered at the hands of his father. Dr. Matthews explained that he did not do this because the account Petitioner gave him was consistent with what was reported in his medical history.[89]

When questioned about his interview with Petitioner, Dr. Matthews testified that Petitioner downplayed his mental illness, but that this was consistent with malingering. Dr. Matthews further testified that he did not feel that anything

Petitioner had done was inconsistent with malingering.[90]

Dr. Matthews testified that he agreed with the proposition that if someone is malingering, this does not preclude the existence of physical, psychiatric symptoms or brain damage.[91]

When questioned about the possibility that Petitioner could become psychotic in the future, Dr. Matthews stated that he did not foreclose that possibility, and that if it happened, it could be the result of the devolution of his borderline personality disorder, the result of substance abuse, or the result of faking.[92]

When questioned by Petitioner's counsel about Dr. Merikangas' diagnosis of schizophrenia, and why Dr. Matthews had not commented of any of the neurological signs that Dr. Merikangas said were consistent with schizophrenia, Dr. Matthews stated that he did not comment because there are almost no neurological signs inconsistent with the diagnosis of schizophrenia. Dr. Matthews further stated that schizophrenia is not diagnosed neurologically, and a schizophrenic could have almost any neurological picture.[93]

Dr. Matthews was not questioned on cross examination as to whether he felt that Petitioner was competent to be executed.

The Court next heard testimony from Dr. Daniel A. Martell, Ph.D. Dr. Martell also had an impressive curriculum vitae, and was accepted by this Court as an expert in psychology.

Dr. Martell testified that he had observed, interviewed and tested the Peti-

---

84. Id., page 790, lines 1–17.

85. Id., page 792, lines 18–21.

86. Id., page 799, lines 1–2.

87. Id., page 804, lines 18–23.

88. Id., page 805, lines 21–22.

89. Id., page 810, lines 1–8.

90. Id., page 816, lines 23–25; page 817, lines 1–18.

91. Id., page 817, lines 19–25.

92. Id., page 820, lines 16–25; page 821, line 1.

93. Id., page 830, lines 6–16.

tioner for approximately nine and one-half hours, seven hours on January 8, 2000, and an additional two and one-half hours on January 9, 2000. Five hours of this was spent observing Dr. Matthews' forensic psychiatric interview of Petitioner. In addition to examining Petitioner, Dr. Martell testified that he had reviewed many documents pertaining to Petitioner, which included the reports of the Petitioner's experts, reports from mental health doctors who had treated Petitioner in the past, records of Petitioner's personal history, and the transcripts from Petitioner's 1996 habeas corpus proceeding.

On direct examination, Dr. Martell testified that he had administered a battery of personality tests to petitioner, as well as conducted an oral interview. Dr. Martell stated that the results of several of the personality tests were invalid and could not be interpreted. Dr. Martell reported that upon his examination of Petitioner, Petitioner was oriented to the world around him, that he knew who he was, where he was, and knew the correct month and year, although he was unsure of the exact day of the month. Dr. Martell reported that Petitioner was "superficially cooperative" throughout both days of the examination, although he later found him to be malingering mental illness.

Dr. Martell reported that Petitioner was a poor personal historian, claiming to Dr. Martell to have a poor memory for significant facts and events in his life, including his criminal case. For example, Petitioner stated that he had his name tattooed on his arm because he could not remember it, and he also claimed to have difficulty remembering his own birth date.

On the other hand, Dr. Martell reported that Petitioner was able to report in great detail other areas of his history, which included his abuse and that of his sisters at the hands of his father, his extensive history of drug abuse, and various details of his criminal case that he believes show him to be innocent.

Dr. Martell noted the same constant rhythmic tremors in Petitioner's feet, legs and fingers that the other doctors had noted.

Dr. Martell reported that Petitioner's thoughts were expressed in a coherent, goal-directed and logical fashion, although his thought content did appear paranoid at times. Dr. Martell reported that Petitioner had denied visual hallucinations to him, but had stated that he did sometimes experience both auditory and olfactory hallucinations.

In regard to his test results, Dr. Martell said the results indicated to him that Petitioner was malingering mental illness. Petitioner's cross examination of Dr. Martell in large part concentrated on the validity of the tests administered by Dr. Martell. In fact, Petitioner's counsel read out loud to the Court several of the questions from the various tests, and commented on their absurdity as far as their relevance to a man in Petitioner's situation. Dr. Martell did admit on cross examination that some of the questions designed to detect malingering on the various tests were inappropriate for a death row inmate, but maintained that the tests were valid tools generally accepted in the field of psychology to test for malingering. Dr. Martell also maintained that the Petitioner was exaggerating his symptoms or malingering.

This Court notes that much ado was made over the validity of the tests administered by Dr. Martell. Although far from dispositive as to Petitioner's competence to be executed, this Court found that the results did have some relevance in the proceedings. Furthermore, the Petitioner's own Court appointed expert, Dr. James Walker, had administered almost the exact same tests to Petitioner as had Dr. Martell, and Dr. Walker and Dr. Martell both testified that these tests are widely used and generally accepted as valid methods of testing in the psychological field. Therefore, this Court allowed the results to be entered into evidence in ac-

cordance with *Van Tran v. State. McDaniel v. CSX Transp. Inc.,* 955 S.W.2d 257 (Tenn.1997), and Tennessee Rules of Evidence 401 and 402. Additionally, as Dr. Martell stated in his report, the ultimate determination of Petitioner's competency for execution is a legal issue, not a mental health issue, and the ultimate question before this Court is not whether Petitioner is malingering mental illness, but rather, does Petitioner have the mental capacity to understand the fact of his impending execution and the reason for it.

In regard to Petitioner's capacity to understand the fact of his impending execution, Dr. Martell reported that Petitioner did understand that "they are going to kill me." Dr. Martell reported that Petitioner had informed him that the warden of River Bend had approached him and asked him to choose the method of his execution, and that he had chosen lethal injection. Petitioner further related to Dr. Martell that he had been offered Valium to sedate him prior to his execution, but that he had refused or planned to refuse. In regard to the refusal of Valium, Dr. Martell reported that Petitioner told him, "I think there might be a God, and I've got enough to deal with him, without being drunk on Valium."

In regard to the reason for his impending execution, Dr. Martell reported that Petitioner was able to state that he had been sentenced to die for the murder of a young girl, although he couldn't remember her name, and stated he was not guilty of her murder. Dr. Martell further reported that Petitioner stated he had been arrested for murder, but claimed he had given a false confession, and attributed the crime to a man named Donald Gant. Petitioner further cited several pieces of evidence to Dr. Martell that he felt proved his innocence. Dr. Martell also referenced the fact that Petitioner is somewhat displeased with his lawyer's efforts to prove him crazy, rather than innocent.

Dr. Martell's final evaluation of Petitioner was that he is a manipulative and psychopathic individual, but that there was no evidence that he was psychotic at the time of his evaluation. Dr. Martell further opined that Petitioner was competent to be executed in accordance with the *Van Tran* standard.

At the conclusion of Dr. Martell's testimony, the state rested its case. In rebuttal, Petitioner called Dr. John Pruett, M.D., who was an attending physician at River Bend from 1994 to 1997. This Court found Dr. Pruett to be a competent and credible witness.

Dr. Pruett testified that in his time at River Bend, he had occasion to *see* Petitioner once every two to three months. On direct examination, Dr. Pruett testified, that DID was a legitimately recognized mental disorder, but that he had only seen one case of it. He further testified that the change in Petitioner's behavior witnessed by Dr. Kenner could be consistent with DID. However, when questioned about the many diagnoses given Petitioner, Dr. Pruett stated that while Petitioner's symptoms were consistent with the plethora of diagnoses. Petitioner's symptoms were also consistent with malingering.

On cross examination, Dr. Pruett testified that schizophrenia could not be diagnosed by the observation of brain structure alone, and that he most likely would not diagnose Petitioner with DID. Dr. Pruett did not render an opinion as to Petitioner's present mental competency to be executed.

Petitioner next called Dr. James Walker, whose report of his examination with Petitioner was referred to several times during the testimony of the other doctors. Dr. Walker is a licensed neuropsychologist, and this Court also found him to be a competent and credible witness.

Dr. Walker testified that he examined the Petitioner on December 23 and 24 of 1999. Dr. Walker stated that during his examination of Petitioner, he administered almost the exact battery of tests to Petitioner that Dr. Martell administered, as

well as conducted a two to three hour interview.

Dr. Walker reported that Petitioner had given him an account of his childhood and the abuse he suffered at the hands of his father consistent to that given to other mental health professionals. Petitioner also reported his history of drug abuse to Dr. Walker. Dr. Walker reported that Petitioner's mental health records since 1996 reflect no clear indications of psychotic thinking or behavior, although the records do indicate consistent complaints of insomnia, anxiety, and urges to masturbate constantly. Dr. Walker reported the Petitioner has been written up innumerable times for public masturbation. In addition, Dr. Walker reported that Petitioner's prison records reflect an increase in complaints of anxiety and insomnia in the two weeks prior to his planned execution date of October 1999, although mental health workers at the prison noted that Petitioner continued to exhibit logical and coherent thought and clear speech.

Dr. Walker reported the following observations about Petitioner's behavior during his examination of him: He was alert and oriented to self, year, season, month, weekday, location and situation, but not date. He was markedly anxious, and psychomotor agitation was evident. Speech was fluent, and speech content reflected no delusions or obsessions. He did report unusual ideas, such as a belief in reincarnation. He used every opportunity during the interview to state his innocence of the crime for which he had been convicted, and to describe how he had been unfairly treated by the justice system.

Regarding the results of his testing of Petitioner, although Dr. Walker's results were similar to Dr. Martell's results, Dr. Walker testified that he did not feel that Petitioner was malingering, as malingering required some purpose or goal, and he could not detect any motivation of Petitioner to escape execution. Dr. Walker further stated that he did not believe Petitioner to be malingering because Petitioner denied any psychosis, took every opportunity to build himself up, and he felt Petitioner's behavior to be consistent with all mental health professionals.

When questioned about the various diagnoses given to Petitioner by the mental health experts in the present hearing. Dr. Walker stated that all of the diagnoses were reasonable, although he would not diagnose him as having DID. Dr. Walker testified that the Petitioner is not psychotic, but that schizotypal, antisocial, and narcissistic personality features were present. Dr. Walker further testified that Petitioner's tendency to lie could best be explained by a diagnosis of pseudologica fantastica, a condition that goes along with Borderline Personality Disorder, but which is not found in schizophrenics.

When questioned as to whether he felt Petitioner was competent to be executed in accordance with the *Van Tran* standard, Dr. Walker stated that he could not reach a conclusion on this, as competency to be executed was not his area of expertise. However, on cross examination, Dr. Walker did admit that in his report he states that Petitioner is aware that his execution is pending. Dr. Walker further reported that Petitioner demonstrated a working knowledge of the legal system, including the roles of the judge, his attorneys, "and so forth." In addition, Dr. Walker reported that Petitioner retains memories of his trial and legal proceedings since his trial, and can explain many or most of the issues involved. Further, Petitioner is aware that he has been accused of a crime, and that the death penalty has been imposed for that crime. In sum, according to Dr. Walker's report. Petitioner has a basic understanding of his current situation and the capacity to act in his best interests if he chooses to do so.

When questioned about Dr. Kenner's assertion that Petitioner's mental state would deteriorate as his execution date approaches. Dr. Walker testified that he had questioned Petitioner closely about the future, going into unpleasant detail about

his impending execution in an effort to test Petitioner's tolerance for imagining the details of his execution. Dr. Walker testified that he could elicit no concern on Petitioner's part that he might deteriorate, nor could Dr. Walker observe any deterioration in response to his questions. Finally, Dr. Walker testified that a psychotic deterioration is not likely, but that it could not be definitively ruled out.

Although he did not testify in court. Dr. Herbert Meltzer submitted to this Court a report of his evaluation of Petitioner, conducted on December 23, 1999. Dr. Meltzer is a psychiatrist at the Psychiatric Hospital at Vanderbilt, whose studies center around schizophrenia. Dr. Meltzer was referred to several times throughout the course of the hearing, and all the medical experts spoke of Dr. Meltzer with great respect.

In Dr. Meltzer's report, he indicated that he utilized the mental health records of Petitioner dated 1975–1981, verbal communication with Dr. Walker, as well as Dr. Walker's written report, and the results of his oral interview with Petitioner. Dr. Meltzer did not take notes during his interview.

Dr. Meltzer reported Petitioner's chief complaint to him was, "I know you are here to find cut if I'm crazy so they can execute me. I am not crazy."

Dr. Meltzer reported that he observed the same constant tremors as had the other doctors, but that Petitioner was able to listen to his questions and make responsive comments, some of which were inappropriate, but most of which were to the point. He further reported that Petitioner exhibited no disorganization of speech, nor any bizarre delusions. To the contrary, Dr. Meltzer reported that considering the Petitioner's level of education and intelligence, he was remarkably lucid about his inner feelings and preferences.

Dr. Meltzer reported that Petitioner is aware that he is facing imminent execution for the crime of which he was convicted. He further reported that Petitioner does understand the nature of the crimes for which he was convicted, does not admit to guilt, believes he cannot obtain clemency or a new trial, and profess to die rather than to live as he currently lives.

Dr. Meltzer reported that Petitioner did not currently meet the criteria for schizophrenia, and instead diagnosed Petitioner as suffering from generalized anxiety disorder, mild dementia or unknown etiology, compulsive masturbation, and possibly borderline personality disorder.

## CONCLUSION

It appears to this Court that Petitioner is suffering from some sort of personality disorder, as attested to by the majority of the mental health examiners. However, the ultimate question of whether the Petitioner is competent to be executed is a question of fact. *Van Tran.* 6 S.W.3d at 271: citing *Ford,* 477 U.S. at 412, 106 S.Ct. 2595 ("the ultimate decision will turn on the finding of a single fact ...."). It appears to this Court that the single fact most relevant to the determination of Petitioner's competency to be executed is the answer to the question of whether Petitioner lacks the mental capacity to understand the fact of his impending execution and the reason for it.

As noted in *Van Tran.* the burden of proof is on the Petitioner to prove his incompetence to be executed by a preponderance of the evidence. This Court finds that Petitioner has failed to overcome the presumption of competency by a preponderance of the evidence. In reaching its decision regarding Petitioner's present mental competency to be executed, this Court has taken into consideration the testimony of the court appointed experts for both the Petitioner and the State, the lay witness testimony, the behavior of the Petitioner during these proceedings, and the reports of the mental health experts submitted to this Court who did not testify.

Throughout all the testimony given, one fact has been constant; that Petitioner

realizes he is facing execution, and that he knows it is because he has been convicted of murdering a little girl. Although he maintains his innocence, it has been made quite clear to this Court that Petitioner understands that he was found guilty of the murder and was sentenced to die. Furthermore, even in light of the myriad of mental health diagnoses given Petitioner, the fact that Petitioner knows he is facing execution for the murder of a young girl was reported by each and every mental health expert. In light of this fact, this Court has no choice but to find that Petitioner is competent to be executed, in accordance with the standard set forth in *Van Tran.*

Accordingly, this Court hereby finds that Petitioner is presently mentally competent to be executed. It is therefore **ORDERED, ADJUDGED AND DECREED** that Petitioner's PETITION TO PROHIBIT EXECUTION UNDER COMMON LAW, *FORD V. WAINWRIGHT,* 477 U.S. 399 (1985) AND THE TENNESSEE CONSTITUTION is hereby **DENIED.**

Entered this 2nd of February, 2000.

John Colton, Judge

Division III